**UNITED STATES of America,**
**Appellee,**

v.

**Ramiro L. COLÓN–MUÑOZ,**
**Defendant, Appellant.**

No. 02–1583.

United States Court of Appeals,
First Circuit.

Heard Dec. 2, 2002.

Decided Feb. 5, 2003.

Peter Goldberger for appellant.

Nelson Pérez–Sosa, Assistant United States Attorney, with whom H.S. Garcia, United States Attorney, and Sonia I. Torres–Pabón, Assistant United States Attorney, were on brief, for appellee.

Before LYNCH, LIPEZ, and HOWARD, Circuit Judges.

LIPEZ, Circuit Judge.

This is the third appeal that Ramiro L. Colón–Muñoz ("Colón") has brought before us in response to his December 1996 convictions on multiple federal charges relating to events that occurred in 1987 and 1988 when he was president of the Ponce Federal Bank (the "Bank") in Puerto Rico. As a result of the first appeal, we affirmed on October 1, 1999 his convictions for conspiracy, misapplication of bank funds, bank fraud, and related counts, but ordered a judgment of acquittal on certain other counts and remanded for re-sentencing on the affirmed convictions. *United States v. Colón–Muñoz ("Colón–Muñoz I")*, 192 F.3d 210 (1st Cir.1999), *cert. denied,* 529 U.S. 1055, 120 S.Ct. 1559, 146 L.Ed.2d 463 (2000).

Following remand, Colón filed a motion on September 13, 2000, under Rule 33 of the Federal Rules of Criminal Procedure, for a new trial on the basis of newly discovered evidence. No action was taken on the new trial motion or the re-sentencing for over eighteen months. Accordingly, in early 2002, over five years after his conviction, Colón remained free on bail and without a sentence.

On April 8, 2002, the Judicial Council of this circuit issued an order pursuant to 28 U.S.C. § 332(d)(1) (1994). This order reflected the Judicial Council's concern with

the backlog of cases that had developed in the docket of the district court judge who presided over the Colón–Muñoz trial and had resumed authority over the case following this court's remand. The Judicial Council's order, which was not concerned in particular with the Colón–Muñoz case, adopted several temporary measures to ameliorate the problem. One such measure was the creation of a three-judge committee of the district court, authorized for a limited period to transfer criminal cases that had been pending before the district judge in question for more than two years, and civil cases pending for more than three years, where the committee determined that this transfer would expedite resolution.

On April 12, 2002, the committee entered an order directing that twenty-four long-pending criminal cases on the docket of the district judge in question, including the Colón–Muñoz case, be randomly reassigned to other judges. Accordingly, this case was transferred to another district judge. Colón moved to retransfer the case back to the original trial judge. On April 24, 2002, Judge Juan M. Pérez–Giménez, the successor judge, denied both the motion to retransfer and the motion for a new trial. On May 14, 2002, Judge Pérez–Giménez resentenced Colón, imposing an amended sentence of sixteen months' imprisonment in lieu of the sentence of twenty-one months that had been imposed following the 1996 convictions, and setting a reporting date of May 17, 2002.

Colón immediately filed a notice of appeal and sought an emergency stay to remain free on bail pending appeal. This court temporarily deferred Colón's reporting date in order to address the emergency motion. There were no disputes relating to Colón's dangerousness or risk of flight. *See* 18 U.S.C. § 3143(b)(1)(A) (1994). Instead, the focus of the emergen-cy stay request was the likelihood that a substantial question of law raised would result in an order for a new trial. *Id.* § 3143(b)(1)(B). After a preliminary consideration of the merits of the pending appeal, in particular the propriety of reassignment of the case for resentencing by a judge who did not preside over the trial, we denied the motion for stay pending appeal and vacated the temporary stay entered on May 17, 2002. *United States v. Colón–Muñoz* ("*Colón–Muñoz II*"), 292 F.3d 18 (1st Cir.2002).

Colón now appeals the decision of Judge Pérez–Giménez denying the motion to retransfer and the motion for a new trial, and the amended sentence itself. With regard to the latter, Colón avers that the sentencing court erred in adding a four-level upward adjustment to his sentence under U.S.S.G. § 3B1.1(a) for his aggravating role in the offense, and claims that, in applying the 2001 Edition of the Sentencing Guidelines Manual (the "Guidelines") to crimes that were committed in 1988, the sentencing court violated the Ex Post Facto Clause. *See* U.S. Const. Art. I, § 9. Concluding that Judge Pérez–Giménez ruled correctly on the motions before him and the resentencing, we affirm.

## I. The Underlying Criminal Case

As the factual background of the case was set forth in great detail in both the appeal of Colón's co-defendant, Jose Blasini–Lluberas, *United States v. Blasini–Lluberas,* 169 F.3d 57 (1st Cir.1999), and Colón's initial direct appeal, *Colón–Muñoz I,* we offer here a limited statement of the facts giving rise to the original convictions. In discussing the motion for a new trial, we describe in greater detail trial testimony relevant to that motion.

On July 15, 1987, Colón and his wife purchased a farm known as "La Esmeral-da" from thirteen members of the Usera

family who had inherited the farm. Colón paid $83,340 at the closing, and the balance of $472,260 was due nine months later on April 14, 1988. As security for the balance of the purchase price, Colón granted the Usera family a mortgage on the property.

Following the purchase of the farm, but prior to the due date of the outstanding $472,260 obligation, four members of the Usera family approached Colón requesting money to satisfy loans unrelated to the sale of the farm.[1] Since Colón was, at this time, president of the Bank, he sent the Useras to see Blasini, then executive vice president of the Bank, and ordered Blasini to assist each of them in securing a loan. Blasini authorized the loans, ranging from $11,000 to $20,000, subject to a standard rate of interest and a due date. Each family member executed partial assignments of their mortgage interests in the farm as security for the loans.

When Colón's debt to the Usera family came due on April 14, 1988, he was unable to satisfy his obligation. On April 19, 1988, another member of the Usera family, Consuelo García–Gómez ("García"), went to the Bank and demanded payment of her share of the purchase price. Each of the thirteen members of the Usera family owned a pro rata share of the purchase price according to each member's inheritance share. García owned the largest share of the inheritance (42.8%), and was entitled to $200,000 of the remaining purchase price. Wendell Colón, Colón's brother and an attorney for the Bank, told García that the money was not available. García then asked for $100,000, and Blasini brought her to a loan officer and instructed the officer to disburse a $100,000 loan to her. The loan application stated that

the collateral for the loan was a partial assignment of García's mortgage interest in the farm, and that the purpose of the loan was the purchase of an apartment. On the application, directly above Blasini's signature, Blasini wrote "discussed and agreed to by attorney R.L. Colón." At trial, García testified that, although she signed the loan documents to receive the $100,000, she did not go to the Bank for the purpose of obtaining a loan and she never read the loan documents before signing them. She maintained that the $100,000 was partial payment of the money owed to her rather than a loan.

On May 13, 1988, Colón paid the balance of the purchase price of the farm to the Useras with two sets of checks from his personal account. The first set paid off the bank loans; the second set paid each family member the balance of what he or she was owed. They then signed a cancellation of the mortgage. When the checks were presented at the Bank for immediate payment, Colón's personal account had insufficient funds to cover the checks. Blasini authorized a bank officer to substitute official bank checks for Colón's personal checks, and the bank checks were debited against Colón's personal checking account which, at the close of business on May 13, was overdrawn by $122,930. The following business day, May 16, Colón deposited $492,394 in his personal account from the proceeds of a $500,000 loan he obtained from the Royal Bank of Puerto Rico.

Colón had applied for this loan a month before, initially contacting the vice president of Royal Bank by phone to discuss the possibility of such a loan. Notwithstanding the fact that in April the Useras still had a mortgage on the farm, Colón

---

1. Vincente Usera Tous received a $20,000 loan from the Bank but died prior to trial and never testified about the loan transaction. His loan application, admitted into evidence, was missing a financial statement and credit history, and it is not clearly established that this particular transaction was to satisfy a loan unrelated to the sale of the farm.

and his wife prepared a mortgage deed which stated that Royal Bank was granted a first mortgage on La Esmeralda. The mortgage deed was filed at the registry of deeds on April 19, 1988. However, in the financial documents submitted to Royal Bank, the Usera family's pre-existing first mortgage on the property was fully disclosed. The loan was approved on May 4 but was not actually disbursed until May 16, 1988, three days after the Useras released their mortgage on the farm. Two years later, in August 1990, Colón received a $615,500 severance package from Ponce Federal Bank which he used to pay off the balance of his loan from Royal Bank.

In 1995, Colón was indicted on multiple counts relating to these transactions. Subsequently, he was convicted at trial on five counts of misapplication of bank funds under 18 U.S.C. § 657, one count of bank fraud under 18 U.S.C. § 1344, one count of false entry under 18 U.S.C. § 1006, one count of benefitting from the loan transactions in question under 18 U.S.C. § 1006, one count of false statement under 18 U.S.C. § 1014, and one count of conspiracy under 18 U.S.C. § 371. The jury also returned a verdict of forfeiture as to Colón's interest in La Esmeralda under 18 U.S.C. § 982(a)(2). Colón was sentenced to twenty-one months' imprisonment followed by two years of supervised release.

On appeal, we found that "there was insufficient evidence to support his convictions on four of the five misapplication counts and the false statement count, and that the forfeiture of the real estate violated the Ex Post Facto Clause of the Constitution," but "affirm[ed] the convictions on one count of misapplication, and on the counts of bank fraud, false entry, fraudulently benefitting from a bank loan, and conspiracy." *Colón–Muñoz I,* 192 F.3d at 214. Those affirmances all related to the transaction with Consuelo García–Gómez.

We remanded the case to the district court for resentencing. The further proceedings on remand prompted the present appeal.

## II. Reassignment

Colón appeals from the district court's denial of his motion for retransfer, challenging the April 12, 2002 order of the three-judge committee of the District Court transferring his case to Judge Pérez–Giménez for resentencing. Colón avers that Judge Pérez–Giménez abused his discretion in two ways. First, Colón argues that the committee's assignment of his case to a new judge was "an improvident application of the [First Circuit] Judicial Council's directive" in violation of Rule 25(b) of the Federal Rules of Criminal Procedure, and Judge Pérez–Giménez's failure to reassign the case in light of this legal error was an abuse of discretion. *See Koon v. United States,* 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (noting that "the district court by definition abuses its discretion when it makes an error of law"); *United States v. Swiss Am. Bank Ltd.,* 274 F.3d 610, 637 (1st Cir.2001) (holding that a determination based on a "legal misunderstanding" constitutes an abuse of discretion). Second, Colón argues that Judge Pérez–Giménez's decision to proceed with resentencing was an abuse of discretion because he was not sufficiently familiar with the case. We disagree on both grounds.

### A. The Ground for Reassignment under Rule 25(b)

■ Each Judicial Council, composed of both circuit and district judges, has broad authority to "make all necessary and appropriate orders for the effective and expeditious administration of justice within its circuit." 28 U.S.C. § 332(d)(1). An order of the Judicial Council reassigning

cases (or providing an impartial mechanism for doing so) to address judicial delay falls within the broad mandate of section 332(d). *See Chandler v. Jud. Council of the Tenth Cir.*, 398 U.S. 74, 98–102, 90 S.Ct. 1648, 26 L.Ed.2d 100 (1970) (Harlan, J., concurring) (addressing legislative history of section 332); *In re McBryde*, 117 F.3d 208, 227–29 (5th Cir.1997) (noting that "judicial council rules promulgated to alleviate judicial delay" have been upheld and that a judicial council has authority to "reassign cases for administrative reasons") (collecting cases).

■ Although Colón does not challenge generally the creation of the reassignment committee, he contends that in reassigning his case after the guilty verdict, the committee acted in violation of Rule 25(b) of the Federal Rules of Criminal Procedure. Rule 25 provides as follows:

(b) **After verdict or finding of guilt.** If by reason of absence, death, sickness or other disability the judge before whom the defendant has been tried is unable to perform the duties to be performed by the court after a verdict or finding of guilt, any other judge regularly sitting in or assigned to the court may perform those duties; but if that judge is satisfied that a judge who did not preside at the trial cannot perform those duties or that it is appropriate for any other reason, that judge may grant a new trial.

Fed.R.Crim.P. 25(b). Colón argues that the committee's reassignment of the case to Judge Pérez–Giménez fails to meet the "by reason of" requirement of Rule 25(b).

We preliminarily addressed this issue in our prior opinion, *Colón–Muñoz II*, in which we denied Colón's motion to stay the order directing him to report to begin his sentence. *Colón–Muñoz II*, 292 F.3d at 20 (Colón's appeal as to reassignment does not "raise a substantial question of law or fact likely to result in a reversal, new trial or reduced term of imprisonment")(internal quotation marks omitted). While that decision is not binding precedent for the purposes of this motion for reassignment, we find the analysis therein to be persuasive authority in addressing the merits of Colón's reassignment claim.

■ As we reasoned in *Colón–Muñoz II*, the "by reason of" language in Rule 25(b) is interpreted broadly. *Colón–Muñoz II*, 292 F.3d at 21. For example, although Rule 25(b) was not at issue in the case, we upheld the recusal and replacement of a district judge between the trial and sentencing phases in *United States v. Snyder*, 235 F.3d 42 (1st Cir.2000). Recusal, not explicitly listed in Rule 25(b), reflects the necessary breadth of the rule. The necessary breadth of the rule encompasses recusal, even though recusal is not listed specifically. *See United States v. Diaz*, 189 F.3d 1239, 1244–45 (10th Cir. 1999), *cert. denied*, 529 U.S. 1031, 120 S.Ct. 1448, 146 L.Ed.2d 334 (2000). It embraces the ground of substantial delay addressed by the reassignment committee in its transfer of Colón's case to Judge Pérez–Giménez.

## B. Familiarity with the Record under Rule 25(b)

■ The second clause of Rule 25(b) (providing that if the successor judge "is satisfied that a judge who did not preside at the trial cannot perform those duties or that it is appropriate for any other reason, that judge may grant a new trial") recognizes that a successor judge, such as Judge Pérez–Giménez, may determine that due to insufficient familiarity with the case, reassignment of the case at the post-verdict stage of the proceedings is not appropriate without a new trial. *See United States v. Whitfield*, 874 F.2d 591, 593 (8th Cir.1989)(holding that a successor judge is

given broad discretion in determining whether a new trial is necessary in order to be able to properly perform his sentencing duties in a case upon which he did not preside at trial); *United States v. Spinney*, 795 F.2d 1410, 1413 (9th Cir.1986). Invoking the spirit rather than the letter of Rule 25(b), Colón did not request a new trial on the basis of Judge Pérez–Giménez's lack of familiarity with the record, and instead asked that the case be returned to the judge who presided over his trial. Judge Pérez–Giménez denied this request.

Although Rule 25(b) does not so require, Judge Pérez–Giménez issued a statement certifying that he was familiar with the record. His detailed treatment of the new trial motion and sentencing objections bears out this familiarity, and there is no indication that reassignment adversely affected the interests of justice in this case. *See United States v. Bourgeois*, 950 F.2d 980, 988 (5th Cir.1992) (holding that a replacement judge is "capable of assessing the credibility of the witnesses and the evidence at trial by a thorough review of the record," after which it is "not an abuse of discretion" to proceed with sentencing). Hence, we conclude that the district court judge did not abuse his discretion by denying the motion to retransfer the case back to the original judge.

### III. Rule 33 Motion for a New Trial

On September 13, 2000, nearly four years after the conclusion of the trial, Colón filed a motion for a new trial based on newly discovered evidence in the form of a revised sworn statement given by Erasmo Rivera–Lebrón, García's friend and accountant, on June 20, 2000.[2]

### A. The Revised Statement

The thrust of the revised statement from Rivera is to undermine García's trial testimony concerning her understanding of the transaction with the bank on April 19, 1988. García maintained that she did not knowingly take out a loan from Ponce Federal Bank. At trial, García testified that she returned to Puerto Rico from her home in Spain in order to receive the balance of her share of the purchase price of the farm, which became due on April 14, 1988. When no payment was forthcoming, she went to the bank where Colón was president on April 19, 1988, to demand her $200,000. Colón was not available so García met with Wendell Colón, Colón's brother and an attorney for the bank. At trial, García testified that when Wendell Colón informed her that the money was unavailable she told him:

> [T]he deadline of the nine months is up. And nobody is telling me absolutely anything. So I expect that you're going to give me something, right. What do you want? [sic] Well, give me a hundred thousand. And he thus gave it to me.

Wendell Colón then took García downstairs to sign "a whole lot of papers" which García maintains she did not read. When questioned about signing a deed without reading it, García responded, "Well, since I was owed two hundred thousand of my money, I didn't think anybody was going

---

**2.** Rule 33 was amended in 1998 to provide that "[a] motion for new trial based on newly discovered evidence may be made only within three years after the verdict or finding of guilty." Prior to this amendment, the time for filing a motion for new trial on the ground of newly discovered evidence ran two years from the "final judgment," which courts uniformly construed to mean the final actions of the Courts of Appeal. *United States v. Reyes*, 49 F.3d 63, 66 (2d Cir.1995)(collecting cases). The verdict in this case was returned in December 1996 and the appeal was actively litigated until three years thereafter, during which time the amended rule came into effect. While we do not decide which version of Rule 33 is applicable in this case, we do not reject Colón's motion as untimely.

to cheat me. It was money of mine. So I didn't think that anybody was going to deceive me." García testified that she did not at any point ask for a loan and did not learn until "later" that she had signed a promissory note and not just received half of the balance of the purchase price.

This testimony was corroborated at trial by García's brother, Francisco García Gómez ("Francisco García"), who had accompanied García to the bank on April 19, 1988. Francisco García added that after leaving the bank they returned to Rivera's house where García was staying while in Puerto Rico. Francisco García testified that the following day, García deposited $75,000 in a certificate of deposit and $25,000 in a passbook. Rivera confirmed that "[García] was told she couldn't collect that day [the money was due] . . . She kept going back to the bank to see—I believe it was Wendell, to collect the money . . . with her brother Francisco." When asked at trial, "Are you aware as to how [García] went about and received the one hundred thousand dollars on April 19 of 1988?," Rivera replied that he only learned that García received the money "[b]ecause after she got the hundred thousand dollars she brought me a document of the hundred thousand to my office, a copy of the document," indicating that he had not been present at the bank on April 19, 1988. However, on cross-examination, García testified that on April 19, 1988, when she signed the promissory note, Rivera had been with her. Francisco García also testified that Rivera had accompanied them to the bank on April 19.

Rivera's revised sworn statement, given on June 20, 2000, contradicts much of his trial testimony. In the revised statement, Rivera asserts that García went to the Bank on April 19, 1988, with the intent to take out a loan "in order to pressure and compel Ramiro Colón to fulfill his agreement" to purchase the farm. Based on this evidence, Colón argues that the plan to structure one of the purchase transactions as a loan originated with García. On this basis, the defense argues it can disprove the prosecution's theory that the idea of using a loan from Ponce Federal to delay fulfillment of Colón's personal obligation to García involved a conspiracy between Blasini and Colón.

Additionally, Rivera's revised statement asserts that when the FBI interviewed him in 1995, he told the FBI that García "had taken a $100,000 loan at the Ponce Federal Bank in order to bind Ramiro Colón, because she was convinced that he would not buy and that the property would be returned to her." In light of the revised statement, Colón impugns the veracity of the FBI's 302 form summarizing the interview with Rivera, which was disclosed as *Jencks* material. *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). The 302 form states that "RIVERA is sure that García went to [the Bank] to collect on the voluntary mortgage, not take out a loan." According to the 302 form, United States Attorney Guillermo Gil and Assistant United States Attorney Jorge Vega were present during the interview. Based on this revised account, Colón concludes that the United States Attorney prosecuting the case not only knew that Rivera and García were perjuring themselves when they testified at trial, but that the government "manipulated the affiant, trial witness Erasmo Rivera Lebrón, and caused him to present testimony the government knew was false or misleading."

## B. Standard of Review

█ Review of the denial of a motion for a new trial is for manifest abuse of discretion. However, the contention that the district court applied an incorrect legal

standard in denying the motion is reviewed de novo. *United States v. Josleyn,* 206 F.3d 144, 151 (1st Cir.2000). Colón contends that the government's knowing use of perjured testimony, and its failure to disclose information from the 1995 FBI interview with Rivera indicating that García had gone to the Bank with the intention of securing a loan, are *Brady* violations, requiring the application of a legal standard different than the one applied by the district court to the new trial motion. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

In order to prevail on a Rule 33 motion based on newly discovered evidence, the movant must show that:

(1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material, and not merely cumulative or impeaching; and (4) it will probably result in an acquittal upon retrial of defendant.

*United States v. Wright,* 625 F.2d 1017, 1019 (1st Cir.1980). However, if the new trial motion is based on an alleged *Brady* violation, the tests for the third and fourth prongs of the *Wright* framework differ from those applied to an ordinary Rule 33 motion. *Josleyn,* 206 F.3d at 151. Specifically, for the ordinary Rule 33 motion, "the evidence must create an actual probability that an acquittal would have resulted if the evidence had been available." *United States v. Sepulveda,* 15 F.3d 1216, 1220 (1st Cir.1993). However, if the government possessed and failed to disclose *Brady* evidence, a new trial is warranted if the evidence is "material" in that there is a "reasonable probability ... sufficient to undermine confidence in the outcome" that the evidence would have changed the result. *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481

(1985); *see also Kyles v. Whitley,* 514 U.S. 419, 434–35, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (holding that in Rule 33 motions involving alleged *Brady* materials, a defendant must show that a reasonable probability exists that, had the evidence been disclosed, the result of the trial would have been different).

## C.  Analysis

Colón asserts that Rivera's revised statement is sufficient to establish a *Brady* violation and, therefore, in evaluating the Rule 33 motion according to the *Wright* framework, the district court applied an erroneous legal standard. Alternatively, Colón argues that the district court abused its discretion when it denied the Rule 33 motion without a hearing to determine whether the Rivera statement presented credible *Brady* violations. Because the threshold showing for securing a hearing on the *Brady* issue is lower than that for establishing a *Brady* claim, we turn first to the claim that the district court erred in denying Colón a hearing.

### 1.  Evidentiary Hearing

A request for an evidentiary hearing is at the discretion of the trial court. *United States v. Calderon,* 77 F.3d 6, 9 (1st Cir.1996). "[A] criminal defendant has no absolute or presumptive right to insist that the district court take testimony on every motion." *United States v. Panitz,* 907 F.2d 1267, 1273 (1st Cir.1990). Instead, the defendant must make a sufficient threshold showing that material facts were in doubt or dispute. *Id.; see also Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (requiring "substantial preliminary showing" of knowing falsity and materiality antecedent to evidentiary hearing); *United States v. Slocum,* 708 F.2d 587, 600 (11th Cir. 1983) (evidentiary hearing on claimed *Bra-*

*dy* infraction properly denied where defendants failed to make prima facie showing of harmful violation). Here, the district court, acting well within its discretion, found that Rivera's revised statement presented in support of the Rule 33 motion failed to meet the threshold of a prima facie showing required for an evidentiary hearing.

In *Strickler v. Greene*, 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), the Supreme Court held that "there are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Id.* at 281–82, 119 S.Ct. 1936. After reviewing the "newly discovered evidence," the district court found Colón's *Brady* allegation of willful suppression of evidence by the government to be "fallacious and contumacious" and "consistently refuted by the record." It noted that "[o]bviously, Defendant seeks to accuse prosecutors of misconduct in order to benefit from the more lenient standard set forth in *Kyles*. However, the Court need not indulge all allegations of prosecutorial misconduct for purposes of a Rule 33 motion, particularly when they are so patently refuted by the record."[3]

The *Brady* claims are based on the premise that Rivera was manipulated by the government, and that his testimony was "improperly shaped by the trial prosecutors to suggest guilt where there was none." On its face, this notion that Rivera's testimony could be shaped by the prosecutors at trial is implausible. Colón

does not argue that Rivera was colluding with the government to present false testimony, thereby permitting the government to ask him open-ended questions and still elicit the "false story" they wanted. Absent this collusion, the government could not "shape" Rivera's testimony at trial without asking carefully structured leading questions proscribed by the Federal Rules of Evidence. *See* Rule 611(c) of the Federal Rules of Evidence.

In fact, the trial record shows that the government was not able to elicit the allegedly "false story" from Rivera's direct examination. Rivera's testimony primarily provided background information pertaining to the relationship between Colón and García. When the government did ask Rivera open-ended questions about the critical transactions that would have allowed Rivera to tell his "true" version of the story, Rivera was vague and evasive, unable to remember crucial details that he asserts four years later in his revised statement.

For example, after establishing that García had received $100,000 from the bank on April 19, the government asked Rivera, "Are you aware as to how she went about and received the one hundred thousand dollars on April 19 of 1988?" Rivera responded, "No, sir. No." This question, far from manipulating Rivera, gave him a ready opportunity to either support García's account of her dealings with Colón, or to assert his present version of events by explaining that he was aware that García had contrived to secure a loan in order to compel Colón to fulfill his agreement to purchase the farm. Rivera did neither.

---

**3.** The district judge appears to have misunderstood one aspect of Colón's new trial motion when it stated that Colón's trial attorney was arguing that a misplaced FBI 302 statement was somehow the fault of the United States Attorney's Office. The *Brady* claim

does not pertain to misplaced documents by the United States Attorney, but rather the claim that the FBI and the United States Attorney knowingly suppressed the version of events now set forth by Rivera in his revised statement.

When asked by the government what he advised García to do with the $100,000 loan check, Rivera responded: "they should deposit the money. And they opened an account in another bank." When asked why he so advised her, Rivera responded, "[w]ell, I don't remember." However, the FBI 302 report in the possession of the parties at trial states that Rivera advised García to deposit the money and "not to use the proceeds of the loan until RAMIRO canceled the voluntary mortgage" because "no other bank would have granted this type of loan. A transaction whereby a loan specifically benefitting the president of a bank given to a third party is a conflict of interest."[4] Again, the government's open-ended question reveals no manipulation of Rivera. Also, Rivera's loss of memory at the trial about his pre-trial views on the impropriety of the transaction structured by Colón undermines the claim of an elaborate scheme by the government to create a false account of Rivera's pre-trial interview and to use that false account at trial.

In addition to its reliance on the trial record to reject the *Brady* claim, the district court considered a) that Rivera waited four years after trial to present his revised testimony, and b) that the two witnesses he sought to impeach, García and her brother, were both now dead. Also, the claim is simply untenable that García, an apparently unsophisticated individual who relied heavily on her CPA for the management of her financial affairs,[5] would devise the loan scheme herself to put pressure on Colón to complete payment on the purchase of the farm.

For all of these reasons, the district court acted within its discretion when it determined that, taking the evidence as a whole, Colón failed to make a preliminary showing sufficient to warrant an evidentiary hearing on the *Brady* allegations.[6] Because this threshold showing is less onerous than that required to establish a *Brady* violation itself, the district court correctly concluded that "it has been established that the evidence was not concealed in violation of the prosecution's duties in *Brady*."

## 2. The *Wright* Standard

Having rejected Colón's *Brady* allegations, the district court correctly evaluated Colón's Rule 33 motion based on newly discovered evidence pursuant to the traditional four-prong *Wright* standard. We review the district court's *Wright* analysis for manifest abuse of discretion. *Josleyn*, 206 F.3d at 151.

The defendant must meet all four prongs of the *Wright* test in order to succeed on a Rule 33 motion. "A defendant's new trial motion must be denied if he fails to meet any one of these factors." *United States v. Gonzalez–Gonzalez*, 258 F.3d 16, 20 (1st Cir.2001). The district court found that "the affidavit provided by Rivera Lebrón is merely impeachment evidence of his trial testimony as opposed to offering new evidence ... [which] means that the third prong of *Wright* is not met in this case."

The district court's determination that Rivera's revised sworn statement was

4. At trial, Colón's attorney objected to questioning Rivera on this passage of the 302 on the grounds that it is "a legal opinion which [Rivera] is not qualified to express in this courtroom" and "far too prejudicial." After an extended sidebar, the judge allowed the line of questioning.

5. When asked about her relationship with Rivera, García replied, "Don Erasmo is the

one who takes care of all my affairs now ....all my things that I have. For instance, if I have this check I will send it to him. Any payment that is made he is in charge."

6. The precise standard to be met to warrant a post-trial evidentiary hearing on an alleged *Brady* violation has not been decided. However, it is certainly more than a mere "colorable claim."

merely an attempt to impeach his own trial testimony was within the bounds of its discretion. Because Colón's Rule 33 motion fails the third prong of the *Wright* standard, the district court's denial of the motion for a new trial was not erroneous. *See Barrett v. United States,* 965 F.2d 1184, 1195 (1st Cir.1992) ("newly discovered evidence which is merely impeaching normally cannot form the basis for a new trial") (quoting *United States v. Bonadonna,* 775 F.2d 949, 957 (8th Cir.1985)).

## IV. Sentencing

On remand, the district court imposed an amended sentence of sixteen months of imprisonment, followed by two years of supervised release with a special condition of 200 hours of unpaid community service, a $10,000 fine, and a special assessment of $250. Colón challenges the sentence on two grounds. First, Colón argues that the sentence was imposed in violation of the Ex Post Facto clause because the district court failed to make a determination of "more than minimal planning" necessary to the comparison between the 1988 Guidelines in effect when the crime was committed, and the 2001 Guidelines in effect at the time of sentencing. Second, Colón challenges the district court's upward adjustment under U.S.S.G. § 3B1.1(a) for his aggravating role in the criminal activity.

### A. Minimal Planning

Section 1B1.11(a) of the 2001 Sentencing Guidelines requires a sentencing court to apply the Guidelines Manual in effect on the date that the defendant is sentenced unless the court determines that such application would violate the Ex Post Facto Clause. U.S.S.G. § 1B1.11(a) (2001); *see also* 18 U.S.C. §§ 3553(a)(4), (5); *United States v. Maldonado,* 242 F.3d 1, 5 (1st Cir.2001) (holding that district court should follow § 3553(a)(4) "only where [the current guidelines] are as lenient as those in effect at the time of the offense"). In arriving at an amended sentence of sixteen months of imprisonment followed by two years of supervised release, the district court applied the 2001 Guidelines rather than the Guidelines in effect in April 1988, when the crimes at issue were committed.

In order to determine whether the 2001 Guidelines are as lenient as those in effect in 1988, the district court had to determine whether an upward adjustment for "more than minimal planning," available in the 1988 Guidelines but not the 2001 Guidelines, would be applicable. We explain this proposition.

### 1988 Calculation

Under § 2F1.1(a) of the 1988 Sentencing Guidelines, offenses involving fraud or deceit have a base offense level of six. However, § 2F1.1(b)(2)(A) instructs the sentencing court: "If the offense involved (A) more than minimal planning ... increase by 2 levels, but if the result is less than 10, increase to level 10." Thus, if the court determined that Colón's offense entailed "more than minimal planning," his offense level under § 2F1.1 would be increased to ten. When a four-level increase is imposed according to § 3B1.1(a) for Colón's aggravating role in the offense, Colón's total offense level under the 1988 Guidelines is fourteen.

Offense Level

| | |
|---|---|
| 6 | Base Offense Level (§ 2F1.1(a)) |
| +4 | Minimal Planning (§ 2F1.1(b)(2)(A)) |
| +4 | Role in the Offense (§ 3B1.1(a)) |

Total = 14

If the district court had determined that the offense did *not* involve "more than minimal planning," Colón's offense level under the 1988 Guidelines would only be 10.

### 2001 Calculation

Under § 2B1.1(a) of the 2001 Sentencing Guidelines, theft, embezzlement, receipt of stolen property, property destruction, and offenses involving fraud or deceit also require a base offense level of six. There is no provision in the 2001 Guidelines for an increase in case of "more than minimal planning." Factoring in a four-level increase under § 3B1.1(a) for Colón's aggravating role in the offense, and a two-level increase under § 3B1.3 for abuse of a position of private trust, brings Colón's offense level under the 2001 Guidelines to twelve.

Offense Level

| | |
|---|---|
| 6 | Base Offense Level (§ 2B1.1(a)) |
| +4 | Role in the Offense (§ 3B1.1(a)) |
| +2 | Abuse of Position of Trust (§ 3B1.3) |

Total = 12

Under the 1988 Guidelines, an adjustment for "abuse of position of private trust" is not available if the defendant also receives an aggravating role adjustment.

■■■ As the comparison of the 1998 and 2001 Sentencing Guidelines calculations makes clear, a determination that the offense involved more than minimal planning is integral to the conclusion that the 2001 Guidelines are more lenient. Colón claims that the district court's failure to address the "minimal planning" issue violates Rule 32(c)(1) of the Federal Rules of Criminal Procedure [7] and necessitates a remand to determine under which Guidelines he should be sentenced. He contends that this failure was not harmless because application of the 2001 Guidelines resulted in a substantially higher sentencing range of 10 to 16 months, compared to the 6 to 12 months range that would apply under the 1988 Guidelines if the district court found that his offense did not entail "more than

minimal planning". Colón further claims that the facts do not support a finding of "more than minimal planning" and, therefore, application of the 2001 Guidelines violates the Ex Post Facto clause.

■■■ We conclude that the district court did in fact make a determination as to the applicability of the "minimal planning" enhancement and therefore did not violate Rule 32(c)(1) of the Federal Rules of Criminal Procedure. Indeed, as the defendant concedes in its brief, "the sentencing court's suggestion that use of the 1988 manual would be *less* favorable to the defendant ... was predicated on the assumption that the four-level planning adjustment *would* apply." In concluding that the 2001 Guidelines would be more favorable to the defendant than the 1988 Guidelines, the district court implicitly concluded that the minimal planning enhancement was applicable. We review this determination for clear error. *United States v. Lopez–Lopez*, 295 F.3d 165, 170 (1st Cir.2002).

The 1988 Guidelines describe three circumstances to which the "more than minimal planning" enhancement applies: 1) where the amount of planning involved exceeded that which "is typical for commission of the offense in a simple form;" 2) where the defendant has taken significant affirmative steps to conceal the offense; and 3) where the offense involved "repeated acts over a period of time, unless it is clear that each instance was purely opportune." U.S.S.G. § 1B1.1 cmt. 1(f) (1988). Although the specific circumstances found by the district court are unclear, we conclude that Colón's actions exceed the amount of planning typical for a commission of the offense of bank fraud

---

7. Fed.R.Crim.P. 32(c)(1) provides in relevant part that at the sentencing hearing, "[f]or each matter controverted, the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account or will not affect sentencing."

in a simple form and, therefore, find no error in the district court's general determination of "more than minimal planning."

Minimal planning activities can involve acts that are not themselves criminal. In *United States v. Duclos*, 214 F.3d 27 (1st Cir.2000), we endorsed a holistic view of "minimal planning" which considers the entire scheme engaged in by the defendant in order to commit the offense as "more in line with the Guidelines' definition of conduct relevant to planning the crime." *Id.* at 32. In *Duclos*, this planning included consideration of non-criminal actions relevant to obtaining information necessary for commission of the offense. *Id.*

The record confirms that Colón undertook more than minimal planning in the commission of bank fraud (and related counts) in connection with the García loan transaction. First, there was the ground work with other members of the Usera family. Colón and co-defendant Blasini established their working relationship in their multiple dealings with the Usera family. As we stated in *Colón–Muñoz I:*

> [t]he jury was not required to divorce these transactions with Consuelo García–Gómez from Colón's transactions with the other members of the Usera family. Although we concluded that there was insufficient evidence to establish the criminality of those other transactions, we also noted that Colón and Blasini were "playing it close to the line" in those dealings.

*Colón–Muñoz I,* 192 F.3d at 226. These prior dealings that provided a model for the fraudulent transaction with García are relevant to the "more than minimal planning" determination. Then, the García transaction itself required considerable paperwork and involved the unwitting participation of an outside party, Marisol Marrero, the bank officer who prepared the falsified documentation for García's loan at the direction of Blasini and Colón.

Moreover, Colón engaged in subsequent activities designed to conceal the offense. Given the self-serving purpose of the García loan and the false claim that the loan was for an apartment, Colón could not allow it to remain on the books. He knew that García did not intend a loan and would not treat it as one. He could not risk having the loan become non-performing. Hence Colón acquired the Royal Bank loan, a transaction not itself criminal, but still an affirmative step to conceal the fraudulent loan. This effort at obfuscation exhibits an additional layer of planning surrounding the offense.

Because the district court correctly determined a four-level increase for "more than minimal planning," its determination that the 2001 Guidelines "are more beneficial" is accurate. Since application of the 2001 Guidelines did not violate the Ex Post Facto clause, the district court did not err in its use of the 2001 Guidelines.

## B. Aggravating Role

In determining Colón's offense level under the 2001 Guidelines, the district court imposed a four-level upward adjustment for Colón's role in the offense according to U.S.S.G. § 3B1.1.[8] Section 3B1.1(a) applies

---

**8.** U.S.S.G. § 3B1.1 provides:

Based on the defendant's role in the offense, increase the offense level as follows: (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.
(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal

where the record shows that a defendant operated as an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."

Colón concedes that he qualifies as a "leader of some sort" but claims that only section 3B1.1(c) is applicable because the record does not show five participants or criminal activity that is "otherwise extensive." Section 3B1.1(c) directs the sentencing court to increase the defendant's offense level by two levels "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b)." U.S.S.G. § 3B1.1(c).

■■■■ "Role-in-the-offense determinations are innately fact-specific. The court of appeals must, therefore, pay careful heed to the sentencing judge's views." *United States v. Rostoff,* 53 F.3d 398, 413 (1st Cir.1995). Thus, we afford deference to the district court, reviewing the court's findings for clear error. *United States v. Dietz,* 950 F.2d 50, 52 (1st Cir.1991) ("[A]bsent mistake of law, we review such determinations only for clear error."). Because Colón concedes that he was an "organizer or leader," the issue on appeal is restricted to whether his criminal activity was "otherwise extensive." [9]

■■■ Extensiveness of the criminal activity within the meaning of § 3B1.1 derives from "the totality of the circumstances, including not only the number of participants but also the width, breadth, scope, complexity, and duration of the scheme." *Dietz,* 950 F.2d at 53. In this case, Judge Pérez–Giménez detailed numerous elements of the criminal activity in

support of his finding of extensiveness. He found that:

> the defendant was the organizer of a criminal activity that was otherwise extensive inasmuch as the following scheme against the bank involved many persons and these were mentioned by Judge Cerezo. Four members of the Usera estate, Ms. Consuelo García Gómez, Victoria Wendel Colon, Madeline Ruben Rivera, co-defendant Jose Blasini, assistant branch manager Marisol Marrero, Notary Public Raul Matos, his spouse, Georgina Ortiz Bechtel and Juan Vicens, the vice-president of the Royal Bank of Puerto Rico at that time and, as I mentioned before, there were also a series of documents that had to be prepared internally within the bank, externally through a notary various deeds were prepared and also there were a number of checks that were issued personally by him and then when they did not have any funds then they were issued through the bank.

In taking note of all the people involved in the scheme, the district court did not impute criminal activity to those whose participation in the scheme was unwitting. Rather, the court acted in accord with § 3B1.1 cmt. 3 which advises that "[i]n assessing whether an organization is 'otherwise extensive,' all persons involved during the course *of the entire offense* are to be considered. Thus, a fraud that involved only three participants but used the *unknowing* services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1 cmt. 3 (2001) (emphasis added). Additionally, although the focus of the extensiveness analysis under § 3B1.1(a) differs from the focus of the "more than

---

activity other than described in (a) or (b), increase by **2** levels.

**9.** Since the language of section 3B1.1(a) is disjunctive, either extensiveness or numerosi-

ty is sufficient for a three or four-level upward adjustment. *Rostoff,* 53 F.3d at 413.

minimal planning" analysis, the determination that Colón's criminal activity involved "more than minimal planning" due, in part, to the number of unwitting participants and the complexity of the scheme itself bolsters the conclusion that the offense was "otherwise extensive."

Affording due deference to the district court's assessment of the record, we conclude that Colón's criminal activities satisfy the extensiveness standard contained in section 3B1.1(a) and find no error in the district court's imposition of a four-level enhancement for the defendant's aggravating role.

*Affirmed.*