United States Court of Appeals

For the First Circuit

Nos. 02-1677, 02-1717

UNITED STATES OF AMERICA,

Appellee,

v.

ANGEL CASAS,

Defendant, Appellant.

No. 02-1708

UNITED STATES OF AMERICA,

Appellee,

v.

Defendant, Appellant.

No. 02-1716

UNITED STATES OF AMERICA,

Appellee,

v.

JOHN CORREY, A/K/A EARTH,

Defendant, Appellant.

No. 02-1996

UNITED STATES OF AMERICA,

Appellee,

v.

ANGEL LUIS PIZARRO-MORALES, A/K/A WEE,

Defendant, Appellant.

No. 02-1997

UNITED STATES OF AMERICA,

Appellee,

v.

Defendant, Appellant.

No. 02-2124

UNITED STATES OF AMERICA,

Appellee,

v.

RAYMOND NICOLAI-CABASSA, A/K/A RAY,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Vargas de Cerezo and

U.S. District Judges
]

Before

Torruella, Lynch and Lipez,

Circuit Judges
.

, for appellant Angel Casas.

Terrance J. McCarthy
Donna R. Newman
, for appellant John Correy.

, for appellant Angel Luis Pizarro-Morales.

Rodney S. Dowell
, with whom 

Linda George
, for appellant Raymond Nicolai-Cabassa.

, with whom 
Lisa Snell-Rivera
, Assistant United States Attorneys, and 
, United States Attorney, were on brief, for appellee.

October 7, 2005

TORRUELLA, 
Circuit Judge
.
I. 
Background

United States District Judge Carmen Consuelo Vargas de Cerezo presided over a jury trial for ten of the co-defendants, including appellants, in the United States District Court for the District of Puerto Rico. Trial began on May 12, 1999 and lasted approximately seven months. The jury convicted all of the appellants of Count One, convicted Pizarro of Count Two, acquitted Correy of Count Four, and acquitted Correy and Nicolai of Counts Five and Six.

II. 
Discussion

Appellants challenge their convictions and sentences on numerous grounds. We address each of these grounds in turn.
2:
We note that co-appellants Casas, Nicolai, and Pizarro seek to adopt by reference all of the issues and arguments raised by their co-appellants, while Flores-Plaza ("Flores") seeks to adopt by reference certain arguments of Bonilla and Correy. 
See

United States
 v. 
David
, 940 F.2d 722, 737 (1st Cir. 1991) (citing 
United States
 v. 
Zannino
, 895 F.2d 1, 17 (1st Cir. 1990)). It is also settled that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." 
Zannino
, 895 F.2d at 17. We apply that rule here. In this complex case involving numerous issues of both fact and law, appellants have argued that their arguments derive from the same legal and factual positions of their co-defendants. However, they have failed to explain why this is so beyond noting that they were co-defendants in the district court, were tried in front of one judge, and were sentenced by another judge. "It is not enough merely to mention a possible argument . . . , leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." 
Id.
 Because appellants have argued for adoption by reference in a perfunctory manner, we deem the arguments waived.

A. 
Conviction

1. Delay

 
Appellants were originally indicted on December 13, 1995, and a superseding indictment was filed on August 8, 1996. Trial commenced on May 12, 1999, approximately forty-one months after appellants were indicted.

a. Speedy Trial Act

We review decisions on issues of fact relevant to the STA for clear error and review questions of law 
de
 
novo
. 
United States
 v. 
Maxwell

Id.

Id.
Nothing in the record before us indicates that Pizzaro actually joined Nicolai's motion. However, as it makes no difference to our decision on this issue, we will proceed on the assumption that Pizarro did in fact join Nicolai's motion.

 Correy filed a 
pro
 
se
Appellants each claim that the STA clock began running on their respective dates of first appearance, and that the seventy-day deadline was far exceeded. However, among the periods excluded from the STA limit are "reasonable period[s] of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." 
Id.
See
 
Henderson
 v. 
United States
United States
Barnes
, 251 F.3d 251, 257-59 (1st Cir. 2001) (applying 
Henderson
see also
 
United States
 v. 
Maxwell
, 351 F.3d 35, 38 (1st Cir. 2003) (applying 
Barnes
 to find that period between appellant's arraignment and co-defendant's later arraignment is excluded from STA calculation). Appellants were among ten defendants severed for trial from the remaining fifty who were charged in the superseding indictment. The last of these ten to appear before the court was Nicolai, on November 6, 1996. Accordingly, the STA clock started no earlier than that date, 917 days before trial.
4:
The language of the co-defendant exception suggests that initial appearances of co-defendants from whom appellants were later severed would also delay the start of the STA clock, provided the appearance occurred prior to severance. 
See
cf.
 
United States

, 944 F.2d 959, 965 (1st Cir. 1991) (treating severed defendant separately "with regard to 
further
 speedy trial calculations" after date of severance) (emphasis added). Nonetheless, we need not decide the issue because even counting from November 6, 1996, we find that the seventy-day time limit was not exceeded.

 Our precedent makes clear that "any defendant's motion resulting in excludable time toll[s] the STA clock for his codefendants." 
United States
 v. 
Santiago-Becerril
, 130 F.3d 11, 19 (1st Cir. 1997) (collecting cases). Accordingly, the government argues that delays during the pendency of motions filed by appellants' co-defendants must be excluded from the STA calculation. 
See
We pause to note that this was just one of many examples of poor briefing by the government. In a case of this magnitude and complexity, careful attention to both the legal claims made by appellants and the record evidence in support or opposition thereof is required. By no means do we suggest that the appellants' briefs are beyond reproach, but we have been particularly disappointed with the inadequacy of the government's briefing, which failed even to mention certain substantive claims raised by the appellants.

 This case began with sixty co-defendants, a number that was cut down to ten by the time of trial. The co-defendants filed numerous motions, and there were also many hearings and appearances before the district court prior to trial. After carefully examining the record, we have concluded that such motions and proceedings tolled the STA for the bulk of the time between Nicolai's initial appearance and trial. The number of non-excludable days for STA purposes, due to the various motions and hearings, was far less than seventy.
6:
It does not, in any case, appear from appellants' briefs that they dispute the government's assertion that if co-defendants' motions toll their STA clock, the seventy-day limit was not expired.

 Appellants Pizarro and Nicolai argue that the exclusion of delays during the pendency of a co-defendant's motion must be reasonable, 
see
Barnes
. 
See
 251 F.3d at 259 (finding no STA violation but noting that "[t]he 
Henderson
 rule anticipates exceptions" and that "in other, less exigent circumstances, the clock may not prove to be so elastic"). According to appellants, because they did not contribute to their delay and because they asserted their speedy trial rights, their STA clocks should be considered separately from the clocks of their co-defendants. Appellants have 
not
 argued that the joining of various co-defendants for trial was unreasonable for STA purposes.

Appellants' reliance on 
Barnes
 is misplaced, and their claims that they were not responsible for any delays are inaccurate. 
Barnes
 involved the re-trial of a defendant after this court vacated her original conviction and ordered her indictment dismissed without prejudice because the government had violated the STA. 
See
 
id.
 at 254. A grand jury promptly issued a second indictment. One day before the defendant-appellant's STA deadline, a grand jury issued a superseding indictment that added a second defendant. This court found no STA violation but expressed concern because the government, "after once violating the appellant's STA rights, . . . filed the superseding indictment only one day before the STA clock was to expire 
again
." 
Id.
 at 259 (emphasis in original). In other words, the 
Barnes
 court was concerned with the appearance of possible manipulation of the STA by the 
government
. In the instant case, however, the causes of delay were the numerous motions filed by the 
co-defendants
, including appellants Pizarro and Nicolai, who between them filed at least thirty-six motions from November 6, 1996 through May 12, 1999, the date trial began.

Further, 
Barnes
See
 
Henderson
Maxwell
, 351 F.3d at 38. Therefore, appellants' argument that delays caused by pretrial motions filed by their co-defendants were unreasonable finds no support in 
Barnes
 and has been rejected by the Supreme Court in 
Henderson
.
7:
It is true that, "in contrast to the potentially unreasonable time that is excluded from STA calculations when a hearing is required, only 30 days may be excluded when a hearing is not required." 
See
 
Maxwell
 Due to the pendency of motions filed by co-defendants, the number of non-excludable days for STA purposes between Nicolai's indictment and trial was less than seventy. Accordingly, no STA violation occurred.

b. Sixth Amendment

Although unusual, it is possible for a delay that does not violate the STA to run afoul of the Sixth Amendment's guarantee of a speedy trial. 
United States
 v. 
Salimonu
see also

In 
Barker
 v. 
Wingo
, 407 U.S. 514 (1972), the Supreme Court identified four factors to be considered in determining whether an appellant's speedy trial rights have been violated: (1) the length of the delay, (2) the reasons for the delay, (3) the defendant's assertion of his speedy trial right, and (4) prejudice to the defendant caused by the delay. 
Id.
 at 530-32. However, "none of the four factors . . . [is] either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." 
Id.
 at 533.

The length of pretrial delay is calculated from either arrest or indictment, whichever occurs first. 
See
 
United States
 v. 
, 182 F.3d 57, 61 (1st Cir. 1999). Correy and Pizarro were both indicted prior to their arrest, in December 1995. Nicolai was arrested on November 6, 1996, although he was already incarcerated in New York after having pled guilty to unrelated charges. Thus, all three waited over forty months for trial. This time period far exceeds the one-year point at which pretrial delay is generally considered to be presumptively prejudicial. 
See
 
Santiago-Becerril
, 130 F.3d at 21-22 (quoting 
Doggett
 v. 
United States
, 505 U.S. 647, 652 n.1 (1992)). Accordingly, the length of delay weighs in favor of appellants' claim of a Sixth Amendment violation.

Due to the complexity and length of this case, we have included citations to the record below in this opinion. Citations to a docket entry are indicated by "(Docket No.__)." Citations to trial transcripts are to the date and page number and indicated, e.g., "(TT 6/2/99: __)." Citations to the Appendix are indicated by "(Appendix: __)."

 Nicolai filed twenty-eight pretrial motions, including two for a continuance or severance. (Docket No. 532, 1040).

Appellants have alleged no bad faith effort by the government to delay the proceedings. Nor do we agree with appellants' assertion that the delay was caused by the judicial system's inability to cope with a case this size. From our review of the record, the district court disposed of the co-defendants' numerous motions in a timely manner and moved the case along to trial. Instead, it appears that delays were due in large part to the resolution of pre-trial matters concerning appellants and their co-defendants.
10:
We note that four of the appellants -- Nicolai, Correy, Pizarro, and Bonilla -- filed motions to continue trial.

 Further, while a case of this size is certainly unwieldy, the joint prosecution of defendants involved in the same drug trafficking conspiracy is justified as a means of serving the efficient administration of justice. Accordingly, we find that the reasons for the delay are sound and weigh against a finding of Sixth Amendment violation.

With regard to the third factor, the government concedes that all three appellants asserted their speedy trial rights in motions filed with the district court. We find, therefore, that the third factor weighs in appellants' favor.

Barker
, 407 U.S. at 532. All three appellants were detained for more than forty-one months prior to trial and likely experienced the disadvantages thereof identified by the Supreme Court in 
Barker
, such as idleness, loss of employment, and disruption of family relationships.
11:
We note that Nicolai was serving a sentence of eleven years to life on New York state drug charges and so would have been incarcerated during the forty-one months before trial in any case. He was, however, transferred to Puerto Rico for pretrial detention, resulting in further separation from relatives in the New York area.

 
Id.
 Lengthy detention is not necessarily, however, "[]sufficient to establish a constitutional level of prejudice." 
Santiago-Becerril
see also
 
Barker
, 407 U.S. at 533-34 (finding that "prejudice was minimal" despite "extraordinary" five-year delay because defendant was only held in pretrial detention for ten months).

The fact that appellants' detention was forty-one months (almost three times the length considered in 
Santiago-Becerril
) causes us great concern. However, we believe that other counterbalancing factors outweigh this deficiency and prevent constitutional error. Appellants have not alleged that the conditions of their confinement were unduly oppressive, and the time served was credited against the sentences they received upon conviction. 
Cf.
 
Barker
, 407 U.S. at 533 (stating that "[i]t is especially unfortunate to impose [the disadvantages of pretrial detention] on those persons who are ultimately found to be innocent"). Moreover, at least some of the delay during appellants' pretrial detention was attributable to their own actions, insofar as the many motions they filed required consideration and disposition by the district court.

Appellants also allege that they suffered prejudice in the form of "anxiety and concern," 
id.

United States
 v. 
Henson
see also
 
United States
 v. 
Colombo
, 852 F.2d 19, 25 (1st Cir. 1998) (emphasizing that 
Barker
 requires minimization, not elimination, of "the natural consequences of an indictment"). Correy and Nicolai both claim that, because they were indicted on murder charges, they experienced heightened concern that they might have to defend themselves against a death sentence, and Correy claims that he was distracted thereby from preparing his defense on other charges. 
See
See

Finally, Nicolai and Pizarro claim that their defense was impaired as a result of the delay between indictment and trial. The Supreme Court identified this as "the most serious [consequence of delay] . . . because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." 
Barker
See
United States
 v. 
Nicolai-Cabassa

Rashad
 v. 
Walsh
see also
 
United States
 v. 
Casas
, 356 F.3d 104, 113 (1st Cir. 2004) (holding that diminished witness recall resulting from delay "'is a two-edged sword . . . [because] [i]t is the Government that bears the burden of proving its case beyond a reasonable doubt'") (quoting 
United States
 v. 
Loud Hawk
The forty-one months that passed between appellants' initial indictment and trial constituted an unusually long wait, particularly for defendants held in pretrial detention. Nevertheless, under the circumstances, we find that the large and complex nature of the proceedings and the district court's obligation to consider the multitude of pretrial matters filed by appellants and their co-defendants are compelling reasons for the lengthy delay, and that appellants did not suffer prejudice of a constitutional dimension as a result thereof. We conclude that there was no violation of the Sixth Amendment as a result of pretrial delay.

Finally, Pizarro and Nicolai argue that the delay between their conviction and sentencing resulted in a denial of their Sixth Amendment rights. They were sentenced on July 11 and July 31, 2002, respectively, approximately thirty-one months after their December 14, 1999 convictions. While "[t]he Supreme Court has not definitively held that [the right to a speedy trial] extends to the sentencing phase," 
United States
 v. 
, 319 F.3d 12, 60 (1st Cir. 2003) (citing 
Pollard
 v. 
United States
, 352 U.S. 354, 361 (1957)), we will assume, without deciding, that it does. 
See
 
id.
see also
 Fed. R. Crim. P. 32(b)(1) (sentence must be imposed "without unnecessary delay"). While the delay between conviction and sentence was, again, unusually long in this case, it was not without good reason. It was necessary for transcripts of the seven-month trial to be prepared and reviewed in order to produce pre-sentence reports (PSRs) for the defendants. In addition, a number of post-trial motions were filed by appellants and their co-defendants. Nicolai filed twenty-two motions following his conviction, at least three of which requested continuances or extensions of time. Pizarro filed seventeen motions, requesting seven continuances or extensions of time. Neither appellant claims to have asserted a constitutional right to a speedy sentence. Nor do they explain what prejudice resulted from the delay, except to suggest that they were prejudiced by having to wait to file the instant appeal. We are not convinced that they were prejudiced, especially since some of the sentencing delay was to give defendants the opportunity to file Rule 29 motions for acquittal and motions for a new trial, which might have mooted the appeal had they been successful. Thus, we find that the delay between appellants' conviction and sentencing caused no violation of their rights under the Sixth Amendment.

c. Motion to sever

Nicolai filed two motions for severance (Docket Nos. 532, 1040), one of which was noted but never ruled on (Docket No. 540), while the other was denied without prejudice pending refiling on December 29, 1998. (Docket No. 1074). The renewed motion was again denied on March 12, 1999 for failure to comply with the order providing an opportunity to amend the earlier motion. Nicolai claims that the district court erred in denying his motions for severance.

We review the denial of a motion to sever for abuse of discretion. 
United States
 v. 
, 356 F.3d 1, 29 (1st Cir. 2004).

To demonstrate abuse of discretion, defendants must show that joinder deprived them of a fair trial, resulting in a miscarriage of justice. Because the general rule is that those indicted together are tried together to prevent inconsistent verdicts and to conserve judicial and prosecutorial resources, severance is particularly difficult to obtain where, as here, multiple defendants share a single indictment.

Id.
 (internal citations omitted). 
See
 
generally
 
Zafiro
 v. 
United States
, 506 U.S. 534, 537 (1993) (noting "a preference in the federal system for joint trials of defendants who are indicted together").

Nicolai claims to have been prejudiced by delay that resulted from being tried jointly with multiple co-defendants and points to the faster resolution of the trials of other co-defendants who were severed before trial. Regardless of whether Nicolai's trial might have been speedier had it been severed, the delays did not cause significant prejudice, nor did they result in the denial of a fair trial or a miscarriage of justice. 
See
United States
 v. 
LiCausi
, 167 F.3d 36, 48-49 (1st Cir. 1999) (determining that appellant must show "'prejudice greater than that which necessarily inheres whenever multiple defendants . . . are jointly tried'") (quoting 
United States
 v. 
Walker
, 706 F.2d 28, 30 (1st Cir. 1983)). We therefore find no abuse of discretion in the district court's denial of Nicolai's motions to sever.

2. 
Grand jury proceedings

 Casas also outlines each overt act in which he was implicated, challenging the sufficiency of the evidence to support his participation.

The petit jury's finding beyond a reasonable doubt that appellants were guilty of the charges alleged in the indictment "demonstrates 
a
 
fortiori
 that there was probable cause to charge the defendants with the offenses for which they were convicted." 
United States
 v. 
Mechanik
, 475 U.S. 66, 67 (1986). Accordingly, "all but the most serious errors before the grand jury are rendered harmless by a conviction at trial." 
, 356 F.3d at 25 (internal quotation marks omitted). "'Only a defect so fundamental that it causes the grand jury no longer to be a grand jury, or the indictment no longer to be an indictment' is sufficient to invalidate a subsequent conviction." 
Id.
 (quoting 
United States
 v. 
, 345 F.3d 1, 4 (1st Cir. 2003)). None of the alleged errors before the grand jury rose to this level.

With regard to the first claim, we note that the government denies the existence of any immunity agreements for the murders prior to the creation of supplemental cooperation agreements during trial. 
See infra
 at 33-38. Even if we were to assume that the agreements did exist, the prosecution's failure to notify the grand jury thereof would not warrant dismissal of the indictment. Because of the nature of the grand jury's function, "[t]he prosecutor before a grand jury is not normally under a duty to disclose exculpatory evidence. Nor . . . is the prosecutor obligated to impeach the credibility of his own witnesses." 
United States
 v. 
Latorre

United States
 v. 
Mangual-Corchado
, 139 F.3d 34, 42 (1st Cir. 1998).

See
 
United States
 v. 
Lebon
United States
 v. 
Doherty
United States
 v. 
Hemmer
, 729 F.2d 10, 17 (1st Cir. 1984) ("Simply because there exist[s] inconsistencies between [a witness's] grand jury and trial testimony does not warrant the inference that the government knowingly introduced perjurious testimony.")
. Absent evidence of "prosecutorial misconduct that actually biases the grand jury in performing its fact-finding function," 
United States
 v. 
Maceo
, 873 F.2d 1, 3 (1st Cir. 1989), we can go no further.
13:
We have previously noted that even "prosecutorial efforts to mislead a grand jury into returning an indictment normally may be addressed by more measured means" than dismissal of the indictment. 
Mangual-Corchado
, 139 F.3d at 42 n.17.

 An indictment returned by a legally constituted and unbiased grand jury "is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence." 
United States
 v. 
Calandra
See
, 
e.g.
, 
, 345 F.3d at 5.

3. 
Prosecutorial misconduct

All six appellants claim that the proceedings below were infected with prosecutorial misconduct to such an extent that they were denied a fair trial. In determining "whether prosecutorial misconduct has so poisoned the well that a new trial is required," 

United
 
States
 v. 
Manning
, 23 F.3d 570, 574 (1st Cir. 1994). Taking a "balanced view of the evidence in the record," 
United States
 v. 
, 202 F.3d 482, 485 (1st Cir. 2000), we evaluate the 
Manning
 factors to determine whether the misconduct likely affected the trial's outcome. 
See
 
Manning

, 202 F.3d at 486 (internal quotation marks omitted).

de
 
novo
, our review of whether the alleged misconduct requires a new trial is for abuse of discretion. 
United States
 v. 
Lewis
United States
 v. 
Glantz
see also
 
United States
 v. 
Mooney

United States
 v. 
Laboy
, 909 F.2d 581, 585 (1st Cir. 1990) (motion to dismiss indictment). Six alleged instances of prosecutorial misconduct are outlined below.
14:
Two additional issues, raised by appellants under the heading of prosecutorial misconduct, are addressed separately below. 
See
 
infra
 Although some of the tactics employed by the prosecutor's office in its zeal to convict crossed the line of acceptable prosecutorial conduct, we conclude that none of the alleged actions likely affected the outcome of the trial. Accordingly, no new trial is warranted.

a. Deception of Court

16:
The BOL reflected responsibility for only five to fifteen of the eighty-one kilograms charged in the indictment. Assistant U.S. Attorney ("AUSA") Jeannette Mercado indicated that the BOL of thirty-two was an oversight, and should have been 34, reflecting responsibility for twenty kilograms, one-fourth of the total volume of cocaine seized. (TT 11/2/99: 74-76). She also testified that the other three defendants who pled guilty for the eighty-one kilograms were held responsible for only twenty (TT 11/2/99: 74), although at least one testified that he had accepted responsibility in his guilty plea for twenty-seven kilograms. (TT 8/19/99: 50).

 The resulting sentence was for sixty months' imprisonment.

19:
As we stated in footnote 14, 
supra

See
 ABA Model Rules of Prof'l Conduct R. 3.3 (2002). That does not mean that these defendants/appellants have any right to complain about what happened with other defendants. But even if we assume that the 
Manning
post
 
hoc
 speculation about whether these defendants would have cooperated as witnesses had their plea agreements been reflective of their actual culpability, we note that both plea agreements explicitly stated that the United States reserved the right to bring additional relevant facts to the attention of the probation department and to dispute facts material to sentencing, and that the sentencing court could exercise its discretion to apply a sentence up to the statutory maximum.

Citing 
Terry
 v. 
Ohio
See
id.
See
 
United States
 v. 
Hasting
, 461 U.S. 499, 506 (1983) (finding "deterrence is an inappropriate basis for reversal where . . . means more narrowly tailored to deter objectionable prosecutorial conduct are available").

b. Failure to disclose immunity agreements

Appellants next argue that the government improperly withheld information about cooperation agreements it granted to cooperating witnesses. The government responds that no such agreements were withheld and that defendants suffered no prejudice insofar as the details of all cooperation agreements were available for use during cross-examination of the cooperating witnesses.

Q. Okay. Did you enter your guilty plea by way of a common plea agreement or a cooperation plea agreement?

A. There was no agreement.

. . .

THE COURT: Didn't he say there was no plea agreement?

[PROSECUTOR]: No cooperation and plea agreement but just a plea agreement, a regular plea agreement.

Chastising the prosecutors for their failure to formalize such agreements in writing and to disclose them to the defense, the district judge denied the motion, finding that defendants' rights could be fully redressed by having the prosecutors file representations with regard to each witness who had already testified concerning the existence of any unwritten cooperation agreements, and by reopening cross-examination to the defense on any such agreements. (TT 8/24/99: 69-72). The court instructed prosecutors to confer with other AUSAs who had worked on the case to ensure that no cooperation agreements were overlooked, and to disclose any such agreements not only for past witnesses, but also for upcoming witnesses.
23:

Suppression of evidence favorable to the defense violates due process. 
Brady
 v. 
Maryland
, 373 U.S. 83, 87 (1963). The 
Brady
 rule applies to evidence affecting key witnesses' credibility, 
Giglio
 v. 
United States
See
 
id.
Kyles
 v. 
Whitley
, 514 U.S. 419, 437 (1995). However,

"[w]hen the [
Brady
/
Giglio
] issue is one of delayed disclosure rather than of nondisclosure, . . . the test is whether defendant's counsel was prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case" . . . [and] [w]e review the district court's decision on how to handle delayed disclosure of 
Brady
 material for abuse of discretion.

United States
 v. 
Catano
, 65 F.3d 219, 227 (1st Cir. 1995) (quoting 
United States
 v. 
Ingraldi
, 793 F.2d 408, 411-12 (1st Cir. 1986)).

Giglio
. However, for each witness, the existence, confirmed or otherwise, of the verbal cooperation agreement came out during cross-examination and was sufficiently investigated by the defense. 
See
 
United States
 v. 
McGovern
, 499 F.2d 1140, 1143 (1st Cir. 1974) (finding no prejudice from late disclosure of cooperation agreement because it occurred while witness was still on the stand and court allowed further cross-examination). No prejudice resulted to defendants.

 c. Violation of sequestration orders

26: d. Offering false testimony

Nicolai, Pizarro, and Correy assert that the government presented testimony at trial that it knew or should have known was false.
27:
In light of our conclusions, 
infra
, regarding sentencing, we find it unnecessary to consider Bonilla's related claim that the government made false representations about his activities and weapons possession to the sentencing judge.

Nicolai frames his argument in terms of the government's failure to corroborate the witnesses' claims, rather than a knowing presentation of false testimony. We construe this argument as asserting that the government should have known that testimony upon which it relied was false.

 The government violates due process when it obtains a conviction by soliciting or failing to correct false evidence. 
Napue
 v. 
Illinois
, 360 U.S. 264, 269 (1959). However, "[n]either 
Napue
 nor any other decision prohibits a prosecutor from calling witnesses who will present conflicting stories." 
United States
 v. 
Doherty
See
 
supra
 at 35-38. Correy also cites Agent Stoothoff's assertion, during his direct testimony as a 
defense
[T]he government is not forbidden to call witnesses whose reliability in one or many particulars is imperfect or even suspect. Its obligations are to make a clean breast of any evidence it has which may contradict such witnesses or undermine their credibility, and not to rest its case upon testimony which it believes to be incorrect.

McGovern
See generally
 
Lebon
Doherty
, 867 F.2d at 70 (finding no decision that "prohibits a prosecutor from calling witnesses who will present conflicting stories").

e. Preservation of evidence

Bonilla argues that he was prejudiced by the government's
29:
We note that the evidence in question was collected by the local law enforcement authorities, and Bonilla has not argued that it was ever in the possession of the federal investigators or prosecutors.

Bonilla also claims prejudice from the government's failure to maintain an electronic organizer in operating condition, resulting in the admission instead of an investigator's partial transcription of its contents. The claim is without merit. The organizer was nonfunctional because its batteries were dead, and rather than risk losing data by changing the batteries, investigators transcribed its contents before it lost power. The district court considered and overruled objections to admitting the transcribed information, holding that there was no evidence of intentional tampering and that the incomplete record of the contents was a topic appropriate for cross-examination. (TT 5/21/99: 67). We find no abuse of discretion in the ruling, nor prosecutorial misconduct in the use of the transcription.

f. Inappropriate gestures

pro
 
se
The trial judge was in a far better position than we to determine whether the alleged gestures and other behavior occurred, whether they appeared to be intentional or inadvertent, and whether they had any influence on witnesses or the jury. We will not second-guess her rulings on the record before us. With regard to those gestures that the court did observe -- nodding at the witnesses, disregarding a ruling, and throwing a pen -- whether they were intentional or not, they were unprofessional and inappropriate. However, they occurred in the context of a seven-month jury trial, were addressed by admonishments from the court, and, from the record, do not appear to have prejudiced Correy or the other defendants. Within the overall framework of this lengthy trial, they were unlikely to have affected the outcome of trial. Thus, they fall short of rendering the trial so unfair as to require a new one.

In sum, we find that none of the alleged instances of prosecutorial misconduct was likely to have affected the outcome of the trial, and thus none requires a new trial. To be sure, "[i]ndividual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect." 
United States
 v. 

id.
 at 1196 -- a seven-month trial of ten defendants on charges stemming from a large and lengthy drug-trafficking conspiracy, during which the trial judge diligently addressed and effectively corrected for errors as they were brought to her attention -- the fairness of the trial was not compromised.

Finally, we note that although "[w]hen confronted with extreme misconduct and prejudice" we may "invoke [our] supervisory powers to remedy the violation of a recognized right, preserve judicial integrity, and deter illegal conduct" by ordering a new trial, we cannot do so "[w]ithout a nexus between improper prosecutorial practice and prejudice to the defendant." 
United States
 v. 
Osorio
see also
 
Bank of Nova Scotia
 v. 
United States
, 487 U.S. 250, 254-55 (1988). We cannot therefore consider action to penalize the tactics employed in this case because appellants were not prejudiced by the prosecutor's actions.

4. 
Juror misconduct

During a trial recess, a court officer heard one of the jurors say that she was jealous and heard another juror explain that it was because Nicolai's wife was in the courtroom.
30:
Apparently, this juror was attracted to Nicolai and was therefore jealous of Nicolai's wife.

 The trial judge decided, over the objection of appellants, to further investigate the matter by interviewing the juror in question. Although the juror initially denied the comment, she eventually made a number of assertions that raised concerns about jury bias, including that some female jurors "liked" certain defendants, that she knew Nicolai was in jail, and that jurors had expressed the opinion that Nicolai was a "cabesilla [sic]"
31:
While the transcript's spelling of the word is "cabesilla", the correct spelling is "cabecilla." 
See
 (kingpin) of a gang. Her responses also suggested that the jurors might prematurely have begun deliberating about the trial by discussing the evidence presented and whether certain defendants should be convicted.

Following the interview, several defendants moved for a mistrial. The court denied that motion, opting instead to 
voir
 
dire
 each member of the jury individually to determine whether any of them had formed an opinion or was improperly affected by the statements of the first juror. Based on the 
voir
 
dire
, the court excused the first juror along with another juror who indicated that she had already made a decision about three of the defendants. The court also denied defendants' renewed motion for a mistrial and to strike additional jurors. Appellants Nicolai and Pizarro argue that the court erred in declining to declare a mistrial or to strike other jurors, largely because a number of jurors allegedly displayed a "lack of candor" when questioned and one juror demonstrated a lack of English proficiency.

"When a non-frivolous suggestion is made that a jury may be biased or tainted by some incident, the district court must undertake an adequate inquiry to determine whether the alleged incident occurred and if so, whether it was prejudicial."
32:
Appellants argue that a presumption of prejudice is required in the instant case because unauthorized communications occurred between jurors and persons associated with the case. 
See
 
, 64 F.3d 11, 13 (1st Cir. 1995) (deeming such communication "'presumptively prejudicial'" and requiring "'a sufficient inquiry to determine whether the communication was harmless'") (quoting 
United States
O'Brien
, 972 F.2d 12, 14 (1st Cir. 1992)). They suggest that outside contact came in the form of a list of defendants' names posted on a bulletin board near public telephones used by jurors, which had the initials "UC" next to those defendants who were under custody during trial. Even with a presumption of prejudice, however, the court's 
voir
 
dire
 of each juror was sufficient inquiry to determine that any such communication was harmless.

 
United States
 v. 
, 64 F.3d 11, 12 (1st Cir. 1995) (internal quotation marks omitted). "[T]he district court maintains significant discretion in determining the type of investigation required by a juror misconduct claim," which "is at its broadest when determining how to deal with an allegation of premature jury deliberations." 
United States
 v. 
Mikutowicz
, 365 F.3d 65, 74 (1st Cir. 2004). We review the district court's actions for abuse of that discretion. 
Id.

voir
 
dire
 transcript, we can find no abuse of discretion in the corrective measures adopted by the district court. Nor did the court abuse its discretion in refusing to instruct each juror not to discuss his or her interviews with the rest of the jury.
33:
We note that each juror was dismissed for the day following his or her 
voir
 
dire
.

 Appellants also argue that one of the jurors ought to have been discharged because she demonstrated a lack of reasonable English proficiency. The juror was questioned and gave responses in English both at jury selection and when interviewed about potential jury misconduct on August 20, 1999. On both occasions, defense counsel was present, but no objection was made. Under such circumstances, our cases require a showing of "'manifest' or 'clear' injustice." 
United States
 v. 
Nickens
, 955 F.2d 112, 117 (1st Cir. 1992) (quoting 
United States
 v. 
Cepeda Penes
Thornburg
 v. 
United States
, 574 F.2d 33, 36 n.5 (1st Cir. 1978). Here, the 
Nickens
 case is controlling, since we determined that:

where the juror[], individually, [was] required to speak some English in the presence of defendant and counsel at the 
voir
 
dire
, where counsel thereafter raised no objection and sought no further inquiry, and where the record itself does not compel the conclusion that the juror[] [was] necessarily incompetent, there was no clear or manifest injustice in [her] service.

Nickens
, 955 F.2d at 118. Indeed, in the instant case, appellants had two opportunities to evaluate the juror's English and to request additional inquiry into her proficiency, but "[t]he opportunity to make . . . further evaluation was irretrievably lost by the failure to object." 
Id.
 at 117. None of the circumstances offered by appellants -- that the juror indicated that her English was "not good," and that she twice requested clarification of a question about whether the jury had an open mind about the case
34:
Appellants note that the juror never answered that question, but this is so because, when asked to clarify a second time, the trial judge changed tack and asked a different question. In addition, appellants suggest that the juror's lack of either comprehension or candor was apparent in her denial of "hav[ing] any opinion" about whether any of the defendants were in jail. This presumes that she knew that at least one defendant was indeed in jail. There is no evidence that this was the case. Indeed, the juror responded in the negative when asked if she had discussed or heard other members of the jury discussing whether any of the defendants had been detained.

5. 
Evidentiary arguments

a. Evidence of killings

See
 
United States
 v. 
Mercado Irizarry
, 404 F.3d 497, 500 (1st Cir. 2005) (evidentiary rulings reviewed for abuse of discretion).

Moreover, appellants have failed to show prejudice from the spillover effects of the testimony in question. The court took adequate measures to guard against spillover prejudice by instructing the jury to consider each charged offense, and any evidence relating to it, separately as to each defendant. (TT 12/13/99: 118). 
United States
 v. 
Bailey
United States
 v. 
Houle
, 237 F.3d 71, 76 (1st Cir. 2001). "We presume that jurors follow such instructions," and the fact that defendants were acquitted on Counts Four, Five and Six "is strong evidence that the jury successfully compartmentalized the evidence and applied the appropriate evidence to the appropriate counts and defendants." 
Bailey
, 405 F.3d at 112. Moreover, Correy's and Nicolai's acquittal on the murder charges suggests that evidence of the killings was not credited or applied against those directly charged in Counts Five and Six. It would be difficult, therefore, to imagine how the same evidence could have prejudiced appellants with respect to Count One. Accordingly, Flores' and Bonilla's appeal on this evidentiary claim fails.

b. Overview testimony

Flores argues, based on our holding in the appeal of four defendants who were tried separately on the same indictment, 
United States
 v. 
Casas
, 356 F.3d 104, 117-24 (1st Cir. 2004), that the trial court erred in admitting improper preliminary "overview" testimony from Agent Stoothoff. In 
Casas
, we made clear that the practice of having a government agent testify broadly to summarize facts not yet (or, as in 
Casas
, never to be) in evidence in an effort to "paint a picture of guilt before the evidence has been introduced," 
id.
 at 119 (quoting 
United States
 v. 
Griffin
, 324 F.3d 330, 349 (5th Cir. 2003)), is "inherently problematic," 
id.

Three points at which Agent Stoothoff testified about the existence and operation of a drug smuggling organization involving the defendants are cause for concern. First, in describing his investigation immediately after the airport arrests, Agent Stoothoff reported that he "tried to identify other co-conspirators that had anything to do with the 81 kilograms of cocaine . . . [and] tried to substantiate what our cooperator at the time . . . had told us about previous trips which he had made for the organization carrying cocaine." (TT 5/18/99: 71). This response assumes the existence of a drug conspiracy or organization about which no facts had yet been offered into evidence. No objection, however, was made by the defense. More disconcerting is Agent Stoothoff's later description of the operations of the alleged organization, in response to a general question about the results of his investigation:

A. Our investigation revealed that this organization had --

MR. MASINI: Objection.

THE WITNESS: Our investigation revealed that this group of people that we identified had previously moved cocaine through the airport in Carolina, Puerto Rico, and continued to move cocaine through Puerto Rico and other entry points such as Miami, up to New York, after --

Objections from two defense attorneys to lack of foundation followed, but were overruled. That ruling was erroneous, as it does not appear from the record that Agent Stoothoff had personal knowledge of the group's activities outside of the incident at the Carolina airport on March 21, 1994.

Q: How large were you able to determine the drug trafficking organization was [sic]?

A: The drug trafficking organization encompassed in excess of 60 people.

Q: What were you able to determine about the roles of in excess of 60 people that were identified to you?

Cf.
 
Casas
, 356 F.3d at 118.

Here, as in the earlier severed trial, Agent Stoothoff "went well beyond his personal knowledge based on the airport incident and the search," and "did not differentiate the testimony that was based on personal knowledge from other sources of information." 
Id.
 at 118-19. Although he did not this time go so far as to "essentially testif[y] that each of the defendants was guilty of the conspiracy charged," 
id.
 at 119, the comments described above are nonetheless improper. The admission of this testimony, however, is harmless as to Flores if the government can show that "it is highly probable that the error did not influence the verdict." 
Id.
 at 121.

35:

6. 
Court Reporter Act

Bonilla argues that the district court erred in allowing the court reporter to read back requested portions of trial testimony in the jury room, without recording the read back. We need not consider the issue, however, because the trial record reflects that no such read back actually occurred, the jury having determined that it did not wish to hear the requested testimony after all. (TT 12/14/99: 14).

7. 
Newly discovered evidence

Pizarro and Nicolai argue that the district court erred in denying Nicolai's motion
37:
Pizarro's request to join Nicolai's motion for a new trial (Docket No. 2280) was denied, the court having already ruled to deny Nicolai's motion, on the same ground as the denial of Nicolai's motion. (Docket No. 2313).

United States
 v. 
Bido
The motion was filed after this case was transferred from Judge Cerezo to Judge Laffitte pursuant to the order of the First Circuit Judicial Council.

 denied the motion, a ruling which we review for abuse of discretion. 
United States
 v. 
, 318 F.3d 348, 357-58 (1st Cir. 2003) (motion for a new trial and evidentiary hearing).

Id.
 at 358 (internal quotation marks omitted). To satisfy the fourth prong, if the evidence has only recently come to the attention of defendant because of a 
Brady
 violation or the government's knowing use of perjured testimony, the defendant must show a "reasonable probability" or "reasonable likelihood" that its timely disclosure would have altered the trial result. 
United States
 v. 
, 258 F.3d 16, 20-22 (1st Cir. 2001). At issue is "whether defendants received a fair trial resulting in a verdict worthy of confidence." 
Id.
 at 22. In the absence of a 
Brady
 violation, or when perjured testimony has been used unwittingly, the defendant must meet the more onerous standard of showing an "'actual probability that an acquittal would have resulted if the evidence had been available.'" 
Id.
 at 20-21 (quoting 
, 15 F.3d at 1220).

Manning
 factors and determined that even if prosecutorial misconduct had occurred via nondisclosure, it did not render the trial unfair because the remaining evidence against Nicolai was so strong that the jury's verdict would not have been altered. We agree and find that the evidence was similarly strong against Pizarro. (Docket No. 2315). Accordingly, the district court did not abuse its discretion when it denied additional discovery and an evidentiary hearing on the basis that Nicolai's claim was "conclusively refuted as to the alleged facts by the files and records of the case," 
United States
 v. 
Carbone
, 880 F.2d 1500, 1502 (1st Cir. 1989) (internal quotation marks omitted), because Nicolai had failed to show that the new evidence undermined the jury's verdict, given the ample evidence against him.

B. 
Sentencing

On April 8, 2002, in response to a backlog of cases on Judge Cerezo's docket, the Judicial Council of the First Circuit entered an order directing a three-judge committee of the District of Puerto Rico to review long-pending criminal and civil cases and to remove those deemed, by a majority vote of that committee, to be likely to be expedited by reassignment. 
See

, 318 F.3d at 354-55 (holding that inability due to substantial delay falls within Fed. R. Crim. P. 25(b)). On April 12, 2002, that committee ordered thirty-five cases, including the one now on appeal, randomly reassigned.
40:
Appellants note that the trial judge expressed disagreement with the reassignment of this and two other of her criminal cases. (Docket No. 2516).

 (attached to Docket No. 2250).

Appellants raised a number of objections to sentencing and now appeal on those bases before this court. We deal with the various objections in turn.

1. 
Reassignment for sentencing

Flores, Pizarro, and Nicolai argue that the committee abused its discretion in reassigning this case, because the record was so voluminous that it would not be possible for the successor judge to adequately familiarize himself with the case.

Fed. R. Crim. P. 25(b)(2) permits a successor judge to order a new trial "if satisfied that . . . a judge other then the one who presided at the trial cannot perform the post-trial duties." We have interpreted this clause to indicate that a new trial may be required if "a judge who inherits a case at the post-verdict stage [is] not . . . sufficiently familiar with the case to sentence the defendants without conducting a new trial." 
United States
 v. 
Casas
see also
 
, 318 F.3d at 356. Ordinarily, however, the successor judge is "'capable of assessing the credibility of the witnesses and the evidence at trial by a thorough review of the record.'" 
, 318 F.3d at 355 (quoting 
United States
 v. 
Bourgeois
, 950 F.2d 980, 988 (5th Cir. 1992)). The trial record in this case is of daunting proportions, and we are all too aware that a thorough review is a time-consuming process, but it is not so insurmountable a task as to render the committee's decision to reassign the case an abuse of discretion. There was no error in the committee's reassignment of the instant case prior to sentencing.

2. 
Sentencing judge's familiarity with record

Appellants next argue that the sentencing judge abused his discretion in refusing to return the case to the trial judge and in proceeding with sentencing because he lacked sufficient familiarity with the record. As we noted above, a replacement judge is ordinarily "capable of assessing the credibility of the witnesses and the evidence at trial by a thorough review of the record." 
Id.
 Courts of Appeals "give great deference to the district judge's decision to proceed with sentencing." 
United States
 v. 
Larios
see also
 
United States
 v. 
McGuinness
, 769 F.2d 695, 696 (11th Cir. 1985) (stating that "[a] sentencing judge enjoys broad discretion to determine whether he can perform sentencing duties in a case he did not try").

In the instant case, approximately one-third of the trial days had not been transcribed at the time of sentencing and thus were unavailable to the sentencing judge for review. This absence of transcripts initially gives us pause, both because of the amount of unavailable transcripts and because credibility was an important issue in appellants' trial. However, after carefully reviewing the record, our concern is lessened due to several factors.

First, our review of the record reveals that, while most of the appellants requested transcripts at one time or another (Docket Nos. 1644, 1645, 1647, 1736, 2143), the transcripts that they requested were made available by the time of their sentencing.
41:
It is true that Flores filed a request for all of the transcripts on December 23, 1999. (Docket No. 1658). However, it appears that the transcripts that he wanted were provided pursuant to an order issued by Judge Cerezo on February 29, 2000. This order instructed the court reporter to prepare transcripts of certain witnesses' testimonies and stated that it had considered Flores's motion. It appears that Judge Cerezo considered Flores's motion, along with the motions of the other appellants, before ordering the transcripts she felt were relevant to their sentencing. (Docket No. 1715).

 Second, the original trial judge ordered only the transcripts that she felt were relevant for sentencing the appellants. (Docket No. 1715). These transcripts were available to the successor sentencing judge. Third, the sentencing judge repeatedly stated that he had reviewed the portions of the record pertinent to defendants' sentencing and cited to specific passages of the transcripts in determining the drug quantity attributable to each defendant.

Larios
, 640 F.2d at 943. While we agree with 
Larios
's proposition, we need not analyze the merits of appellants' complaints on this issue further because we are remanding their cases for re-sentencing -- at which appellants and the sentencing judge will have access to all of the transcripts -- due to 
Booker
 error and violations of Fed. R. Crim. P. 32(e). 
See infra
.
42:
While we reach no decision on whether the lack of transcripts in and of itself warranted re-sentencing, we note that the lack of transcripts available at sentencing plays a role in our analysis of the 
Booker
 claims of Casas and Correy, which we discuss below.

 3. 
Federal Rule of Criminal Procedure 32(e)
43:
In this section, we discuss Fed. R. Crim. P. 32(e) only as it relates to Bonilla, who did not make a 
Booker
 argument to this court. However, Rule 32(e) is also relevant to 
Booker
 arguments made by Casas and Correy, which we discuss 
infra
.

 Under the Federal Rules of Criminal Procedure, "[t]he probation officer must give the presentence report to the defendant, the defendant's attorney, and an attorney for the government at least 35 days before sentencing unless the defendant waives this minimum period." Fed. R. Crim. P. 32(e)(2).
44:
At the time of Bonilla's sentencing, the notice requirements for PSRs were found in Fed. R. Crim. P. 32(b). Per amendments effective December 1, 2002, Rule 32 was renumbered and the notice requirements were moved to Rule 32(e).

 Bonilla argues that, pursuant to an order from Judge Cerezo, the Probation Office was required to prepare a revised PSR that contained findings regarding the quantities and types of drugs attributable to Bonilla. Bonilla never received a revised PSR prior to his sentencing hearing. Before addressing this argument, we pause to briefly provide background.

Bonilla, along with the other appellants, was convicted of Count I, conspiracy to possess with intent to distribute approximately 1400 grams of heroin and 9445 kilograms of cocaine. We have consistently held that

when a district court determines drug quantity for the purpose of sentencing a defendant convicted of participating in a drug-trafficking conspiracy, the court is required to make an individualized finding as to drug amounts attributable to, or foreseeable by, that defendant. In the absence of such an individualized finding, the drug quantity attributable to the conspiracy as a whole cannot automatically be shifted to the defendant.

United States
 v. 

see also
 
United States
 v. 
, 15 F.3d 1161, 1197 (1st Cir. 1993). On July 11, 2000, Bonilla was scheduled for his sentencing hearing before Judge Cerezo. At the hearing Judge Cerezo found that the PSR contained no findings as to the quantities or types of drugs attributable to Bonilla.
45:
The offense conduct in the PSR was based solely on the overt acts alleged in the indictment as to the entire conspiracy. However, the jury did not issue a special verdict or rule on the overt acts alleged in the indictment. The PSR thus contained no findings as to drug type or quantities attributable to Bonilla based on evidence in the record.

 In accordance with the principles set out in 
, Judge Cerezo vacated Bonilla's sentencing hearing. She then instructed the U.S. Probation Officer

to utilize methods of calculation based on these principles [in 
] and on the evidence presented at trial which is relevant to Mr. Bonilla-Lugo. Since this case was a lengthy trial, and compliance with this order shall require the Officer to read voluminous trial transcripts, as she/(he) must do as to the other defendants waiting sentence, a term of forty five (45) days is granted for the U.S. Probation Officer to comply with this order.

The Probation Officer confirmed this fact at the sentencing hearing, telling the sentencing judge that "I was directly ordered by the Honorable Judge Cerezo, and my response was sent directly to her. I was not ordered to disclose that information to any of the parties." The record does not show any such limitation on disclosure being ordered by Judge Cerezo and, of course, it would be improper for the Probation Office to fail to disclose to counsel a PSR that was to be relied upon by the court.

 Bonilla's counsel apprised the sentencing judge of this fact. The judge, who had received the updated PSR, allowed Bonilla's counsel to read the supplement. After reading it, Bonilla's counsel asked for more time, stating "I've read this memorandum, and it's wrong, Your Honor, and I need time to prove that, and I have it in the record. I can proof (sic) it from the record."
47:
While counsel did not utter the word "continuance," it is obvious from her statement that she was requesting a continuance.

 Specifically, Bonilla's counsel insisted that, if she had more time, she could refute the quantity of drugs that the PSR attributed to Bonilla. The sentencing judge refused to grant a continuance and sentenced Bonilla to 235 months imprisonment.

"We ordinarily review the district court's failure to continue the sentencing hearing for abuse of discretion." 
United States
 v. 
, 295 F.3d 165, 169 (1st Cir. 2002). We believe that, in this case, the district court abused its discretion by not continuing the sentencing hearing. We explain briefly.

Id.
 Further, one reason for a PSR is so that parties do not have to comb through voluminous trial transcripts to anticipate remaining factual and legal issues. 
See
 
United States
 v. 
Butler
4. 
Booker

Sentencing in this case occurred after the Supreme Court's decision in 
Apprendi
 v. 
United States
, 530 U.S. 466 (2000), but prior to its related decisions in 
Blakely
 v. 
Washington
, 542 U.S. 296 (2004), and 
United States
 v. 
Booker
, 125 S. Ct. 738 (2005). 
Booker
, however, applies to cases pending on direct appeal at the time of its decision, 125 S. Ct. at 769, and 
Booker
 error did occur in this case insofar as the defendants were sentenced under a mandatory Guidelines system. 
See
 
United States
 v. 
Antonakopoulos
, 399 F.3d 68, 76 (1st Cir. 2005). All appellants except for Bonilla seek remand on the basis of 
Booker
 error, although not all have preserved the error.

a. Preserved 
Booker
"This court deems 
Booker
 error preserved if the defendant argued at sentencing that the sentence violated 
Apprendi
 or 
Blakely
, or that the federal Sentencing Guidelines were unconstitutional." 
United States
 v. 
, 418 F.3d 90, 109 (1st Cir. 2005) (citing 
Antonakopoulous
, 399 F.3d at 76). "Where a defendant has preserved a 
Booker
 claim, we review for harmless error, remanding for re-sentencing unless the government can show beyond a reasonable doubt that a lower sentence would not be imposed under the post-
Booker
 regime." 
Id.
 (citing 
United States
 v. 
, 407 F.3d 476, 489 (1st Cir. 2005)). Three of the appellants, Nicolai, Pizarro and Flores, have preserved 
Booker
 claims.

Nicolai asserted an 
Apprendi
 error at his sentencing, arguing that the jury failed to specify the type and quantity of drugs for which he was convicted. The government concedes that Nicolai preserved a 
Booker
 claim and also concedes that it cannot prove harmless error. We agree and remand his case for re-sentencing.

The government also concedes that Pizarro preserved a 
Booker
 claim. At his sentencing, Pizarro objected that the jury did not make a finding on the issue of drug quantity. When the district judge asserted that there was no 
Apprendi
 issue, Pizarro's counsel responded that "[w]e believe, Your Honor, that there is room in that respect." We agree with the government that Pizarro preserved a 
Booker
 claim.
48:
We recently found that, where a district judge, 
sua
 
sponte
, mentioned that there were no 
Apprendi
 problems in sentencing, we would not "allow the defendant to piggyback upon the court's off-hand comment . . . and use it as a means of 'preserving' his claim of 
Booker
 error." 
United States
 v. 
Martins
, 413 F.3d 139, 153 (1st Cir. 2005). Pizarro's situation is distinguishable from the situation in 
Martins
 in that the district judge's mention of 
Apprendi
 was not an off-hand comment but was a response to Pizarro's objection, which by its nature raised 
Apprendi
 concerns.

 As with Nicolai, the government also concedes that it cannot prove harmless error, and, as with Nicolai, we agree. Thus, we also remand Pizarro's case for re-sentencing.

The government does not concede that Flores preserved a 
Booker
 error. However, we see no distinction between what occurred at Flores's sentencing and what occurred at Pizarro's. At his sentencing, Flores objected that "the jury didn't render any sort of special verdict concerning the amounts [of drugs] that were attributable [to Flores]." The district court asserted that "there is no 
Apprendi
 issue," to which Flores replied "we do not concede that." Flores made the same argument that Pizarro made at his sentencing: that because the jury did not make a finding as to drug quantity he could not be sentenced above the default statutory maximum based on findings made by the judge.
49:
In his 
Apprendi
 argument, Nicolai also objected that "the jury was not given a special verdict and that jury did not come back with specific quantities."

 As with Pizarro, the district judge understood the argument as an 
Apprendi
 argument and replied that there were no 
Apprendi
 issue. Also as with Pizarro, Flores expressed a belief that there was an 
Apprendi
 issue when he stated that he did not concede 
Apprendi
. As we have stated, we have "offered to treat almost any colorable claim in the district court as preserving the 
Booker
 issue," 
United States
 v. 
Heldeman
, 402 F.3d 220, 224 (1st Cir. 2005), and we believe that Flores has preserved a 
Booker
 claim.

We must now address whether any error was harmless, 
i.e.
, whether the government has convinced us "that a lower sentence would not have been imposed had the Guidelines been advisory." 
, 407 F.3d at 489. We have characterized this standard as "extremely difficult, but not impossible . . . to meet." 
Id.
 at 489-90. Further, we have remanded for re-sentencing where "the government has pointed to no statement or action of the sentencing judge that would assure us that he would have imposed the same sentence in the absence of mandatory Guidelines." 
Id.
 at 490.

A review of the transcript of Flores's sentencing reveals that the sentencing judge stated that "I cannot depart . . . [a]nd even if I had the discretion to depart, I wouldn't depart." However, upon a closer reading, it is evident that the sentencing judge was speaking only about departures for prosecutorial misconduct. There could very well be other reasons the district court would have departed under discretionary guidelines. We note that Flores has argued that his sentence was enhanced above the maximum sentence authorized by jury fact-finding or admitted facts, and that, in such a situation, a judge's "'factual certainty alone' in support of such enhancements 'would not be sufficient to show beyond a reasonable doubt that the judge, acting under an advisory Guidelines system, would have applied the same sentence on the basis of those factors.'" 
United States
 v. 
Fornia-Castillo
, 408 F.3d 52, 73-74 (1st Cir. 2005) (quoting 
, 407 F.3d at 489-90).

Further, the district judge sentenced Flores at the low end of the guideline range, rejecting the government's request for a sentence at the upper-end of the guideline range. 
See
 
, 407 F.3d at 490 (stating that "our doubt . . . is enhanced by the fact that, while the applicable Guidelines constrained the sentencing judge to the upper margin of sentences available under [the relevant statute], the sentence he chose was at the low end of that margin"). On the balance, we are not convinced beyond a reasonable doubt that Flores would not have received a lower sentence had the Guidelines been advisory. We therefore remand Flores's case for re-sentencing.

b. Unpreserved 
Booker
 error

The remaining two defendants,
50:
Bonilla has not argued a 
Booker
 error before us.

 Casas and Correy, have not preserved a 
Booker
 claim. Casas argues that he preserved a 
Booker
 claim because he objected to the computation of the drug amounts attributable to him and because the district court stated that it had "to do an 
Apprendi
 verdict." However, unlike the defendants who preserved 
Booker
 claims, Casas never actually argued 
Apprendi
. While the district court mentioned 
Apprendi
, it did so in an off-hand manner while responding to Casas's arguments regarding sentence disparity. Casas therefore has not preserved a 
Booker
 claim. 
See
 
United States
 v. 
Martins
, 413 F.3d 139, 153 (1st Cir. 2005) (stating that a defendant may not "piggyback upon the court's off-hand comment [about 
Apprendi
] . . . and use it as a means of 'preserving' his claim of 
Booker
 error"). Correy argues that he preserved a 
Booker
 claim because he alerted the court in a 
pro
 
se
 motion that he had asked his counsel to object to his original PSR on 
Apprendi
 grounds, but that his counsel never made the objection. We are doubtful that this is sufficient to preserve Correy's 
Booker
 claim, as parties are generally bound by the acts of their lawyers. 
See
 
Chestnut
 v. 
City of Lowell
, 305 F.3d 18, 26 (1st Cir. 2002). Further, although Correy filed his 
pro
 
se
 motion before sentencing, indicating that he believed he had an 
Apprendi
 argument, neither he nor his counsel mentioned 
Apprendi
 at the sentencing hearing. Because, as we discuss below, we find plain error, we will merely assume, without deciding, that Correy failed to preserve a 
Booker
 claim.

We review unpreserved 
Booker
 claims for plain error. 
Antonakopoulos
, 399 F.3d at 75. Defendants must satisfy a four-prong test: (1) that there was an error, (2) that it was plain, (3) that it affected substantial rights, and (4) that the error seriously impaired the fairness, integrity, or public reputation of the judicial proceedings. 
United States
 v. 
Olano
, 507 U.S. 725, 732 (1993). The first two prongs are met whenever a district court treats the Guidelines as mandatory when imposing a defendant's sentence. 
See
 
Antonakopoulos
, 399 F.3d at 75. To meet the other two prongs, defendants must ordinarily show "a reasonable probability that the district court would impose a different sentence [that is] more favorable to the defendant under the new 'advisory Guidelines' 
Booker
 regime." 
Id.
 In 
Antonakopoulos
, we stated that a procedural error in the application of the Guidelines that would have led us to remand a case for re-sentencing pre-
Booker
 would likely provide a basis for remanding unpreserved 
Booker
 claims. 
Id.
 at 81. We find that such an error occurred regarding both Casas and Correy in that, like Bonilla, Fed. R. Crim. P. 32(e) was violated in connection with their sentencing.

i. 
Casas

 As we noted in our discussion of Fed. R. Crim. P. 32 and Bonilla, Judge Cerezo vacated Bonilla's original sentencing hearing because the PSR contained no findings as to the quantities or types of drugs attributable to Bonilla. Judge Cerezo also issued an order instructing the Probation Office

to utilize methods of calculation based on these principles [in 
] and on the evidence presented at trial which is relevant to Mr. Bonilla-Lugo. Since this case was a lengthy trial, and compliance with this order shall require the Officer to read voluminous trial transcripts, 
as she/(he) must do as to the other defendants waiting sentence
, a term of forty five (45) days is granted for the U.S. Probation Officer to comply with this order.

(emphasis added). On May 1, 2002, Casas requested that his sentencing hearing, scheduled for May 7, 2002, be continued until he received a revised updated PSR containing findings of the quantities or types of drugs attributable to him.

At his sentencing, Casas again requested a continuance. He stated that he had understood Judge Cerezo's order to apply to all the defendants and thought that his PSR "would be amended to show the [drug] calculations as to specific amounts." [2359, 5/7/02, p. 4, l. 5-6]. Casas then protested that he had never received the revised PSR. The Probation Officer stated that she had applied Judge Cerezo's order only to Bonilla and therefore did not prepare a revised PSR for anyone but Bonilla. After reading the order, the sentencing judge concluded that it applied only to Bonilla. The government then explained what evidence it relied upon regarding the quantity of drugs it believed were attributable to Casas. This explanation was based on information from the government's response to Casas's motion for a continuance. Casas, however, had not received the government's response, which had been put in the mail on May 3, 2002, two business days before the May 7 sentencing hearing. Casas's counsel objected to the evidence used by the government, arguing that he should have an opportunity to address the government's evidence with specificity. The sentencing judge initially denied this objection and began to discuss trial transcripts regarding the quantities of drugs attributable to Casas.
51: However, after Casas's counsel strenuously objected, the sentencing judge agreed to continue sentencing until 9:30 the following morning. After Casas's counsel again vigorously protested, the sentencing judge continued the sentencing hearing for three days.

On May 10, 2002, Casas again requested a continuance in order to have time to dispute the evidence relied upon by the government regarding the drug quantities attributable to Casas. This request was denied, and Casas was sentenced to 235 months imprisonment.

as she/(he) must do as to the other defendants awaiting sentence

Second, consideration of the circumstances surrounding the order bolsters our conclusion that it applied to all of the co-defendants. All of the co-defendants had been tried before Judge Cerezo and convicted of the same count. A review of the original PSRs of several of the co-defendants, including Casas, Bonilla and Correy, reveals that they were all identical in that they did not contain findings as to the quantities or types of drugs attributable to the individual defendants.
52:
As with Bonilla, the offense conduct in the other PSRs was based solely on the overt acts alleged in the indictment as to the entire conspiracy and not evidence in the record, even though the jury did not issue a special verdict or rule on the overt acts alleged in the indictment.

 In other words, all of the PSRs contained the same defect that caused Judge Cerezo to vacate the sentencing hearing of Bonilla, who was the first of the appellants scheduled for sentencing before Judge Cerezo.
53:
While Bonilla was the first of the appellants scheduled for sentencing before Judge Cerezo, Casas was the first scheduled for sentencing before Judge Laffitte.

 Further, these PSRs had been submitted to Judge Cerezo prior to her order on July 11, 2000. It is highly improbable that Judge Cerezo would have ordered the Probation Office to revise Bonilla's PSR so that it contained individualized drug quantities for Bonilla but did not mean for the Probation Office to do the same for Bonilla's co-defendants who had been convicted of the same count and whose PSRs contained the same defect.

In light of the order's language and the surrounding circumstances, we conclude that the order applied to all the defendants. The Probation Office, which failed to deliver the revised PSR to Bonilla, therefore also failed to prepare a revised PSR for Casas. Like Bonilla, this is contrary to Rule 32(e)(2), in that neither Casas nor his attorney received the updated PSR at least thirty-five days prior to sentencing. 
See
 Fed. R. Crim. P. 32(e)(2).

At oral argument, the government argued that any error was harmless. We disagree, essentially for the same reasons that we found the claimed error in Bonilla's case not to be harmless. We believe this to be true even considering the fact that Casas was given a three-day continuance by the sentencing judge. In this complex case, which involved a seven-month trial with trial transcripts totaling over 8500 pages, we do not think that three days was enough time for Casas to adequately challenge the government's drug quantity calculations. Casas should have been given the thirty-five days required by Rule 32(e) to review a revised PSR.

This violation of Rule 32(e) was a procedural error that would have led us to remand for re-sentencing pre-
Booker
. 
See
 
Antonakopoulos
, 399 F.3d 68. As we stated in 
Antonakopoulos
, such a procedural error will likely provide a basis for remanding unpreserved 
Booker
 claims. 
Id.
 Given the violation of Rule 32(e), we believe that there is a reasonable probability that the district court will impose a more favorable sentence on remand. We base this belief on the fact that, in addition to being sentenced under advisory Guidelines, Casas will have adequate time to review the trial transcripts in order to attempt to rebut the government's claim as to the amount of drugs attributable to him. We therefore remand Casas's case for re-sentencing. In doing so, we make no "suggestion or . . . prediction that the sentence will necessarily be altered." 
Heldeman
, 402 F.3d at 224.

ii. 
Correy

At his sentencing hearing on May 7, 2002, the government claimed it had not received objections to the amended PSR. However, the docket sheet shows entries on both May 31, 2000 and June 5, 2000 for objections by John Correy to his amended PSR.

 Like Bonilla's PSR, Correy's amended PSR was based solely on the overt acts alleged in the indictment, and not on any evidence in the record. In his objections filed June 5, 2000, Correy specifically argued that the PSR should have been based on evidence in the record, and not just the overt acts alleged in the indictment. All of this occurred before Judge Cerezo's order on July 11, 2000, which, as we have already discussed, applied to all defendants.

It is unclear whether Correy based his objection on Judge Cerezo's order or on the fact that there had been no response to his June 2, 2000 objection that the PSR was based solely on statements in the indictment and not on evidence in the record. However, we do not believe it makes any difference, as the substance of Correy's objection, that the PSR did not contain any findings as to the quantities of drugs attributable to him individually, remained the same.

 At his sentencing hearing, Correy told the district court that he still had not received a final PSR. As with Casas and Bonilla, the district court attempted to get around the problem by referring to a trial transcript that contained witness testimony dealing with Correy's individual drug quantities.

We believe that, as with Bonilla and Casas, Rule 32(e) was violated in connection with Correy's sentencing. Correy never received a revised PSR before sentencing, as he should have pursuant to Judge Cerezo's order. Correy objected to the lack of individualized drug quantity findings and also joined a motion that made an objection based on Rule 32's thirty-five day notice requirement. While the district court referred to record evidence at Correy's sentencing, this does not change the fact that Correy never received a revised PSR. Nor are we persuaded that any error resulting from this violation was harmless, for the same reasons that we did not find that the error was harmless in Bonilla's or Casas's case. Finally, we believe that there is a reasonable probability that the district court will impose a more favorable sentence under advisory Guidelines, as Correy will have adequate time to review the trial transcripts in order to attempt to rebut the government's claim as to the amount of drugs attributable to him. We therefore remand Correy's case for re-sentencing.
56: As we noted above, this "remand should not be taken as either a suggestion or a prediction that the sentence will necessarily be altered." 
Heldeman
, 402 F.3d at 224.

5. 
Apprendi

With the exception of Bonilla, all of the appellants argued on appeal that their sentences violated 
Apprendi
. In 
Apprendi
, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 
Apprendi
, 530 U.S. at 490.

This court addressed the relationship between 
Apprendi
 and 
Booker
 as to drug quantity determinations in 
United States
 v. 
, No. 04-1853, 2005 WL 2046023 (1st Cir. 2005). Although no defendant can be sentenced under the guidelines beyond a statutory minimum, under 
Booker
 a judge may make the drug quantity findings necessary to trigger a statutory maximum. 
Id.
 at *2. As we said in 
,

[u]nder the 5-4 constitutional ruling in 
Booker
Booker
, this problem is washed out by treating the guidelines as advisory. A defendant sentenced under the mandatory regime may be entitled to re-sentencing under the advisory one[,] . . . but 
Booker
 both created and cured the constitutional error at the same time.

Id.
 Given the jury instructions, there is some doubt about the correctness of the government's argument that the problem of drug quantity was taken care of by the jury verdict that found the defendants guilty as conspirators. That is beside the point because the evidence overwhelmingly establishes that the conspiracy involved at least five kilograms of cocaine or one kilogram of heroin, which are the amounts necessary to support a statutory maximum of life imprisonment.
57:
We note that Casas has not established an 
Apprendi
 violation at all. Casas was sentenced to 235 months' imprisonment, which is five months less than the default statutory maximum. There is therefore no 
Apprendi
 violation regarding his sentence. 
See
 
United States
 v. 
Goodine
, 326 F.3d 26, 33 (1st Cir. 2003) (stating that even if drug quantity "influences the sentence, but the resulting sentence is still below the default statutory maximum, there is no 
Apprendi
 violation").

 
See
 
United States
 v. 
, 356 F.3d 1, 48 (1st Cir. 2004) (stating that, for 
Apprendi
 purposes, "the conspiracy-wide drug quantity determines the statutory maximum").
58:
Certain appellants appear to argue that the 
Apprendi
 violation was that the jury failed to determine that amount of drugs that were attributable to them individually. However, we have consistently held that, for 
Apprendi
 purposes, it is the drug quantity attributable to the entire conspiracy that determines the statutory maximum. 
See
, 
e.g.
, 
, 356 F.3d at 48.

conspiracy-wide
 drug quantities testified to at trial, nor do they offer any explanation for why the jury would believe the government witnesses regarding each appellant's activities in furtherance of the conspiracy, yet discredit their testimony regarding the type or quantity of drugs involved in the conspiracy. 
See
 
id.
 at 47 (stating pre-
Booker
 that we have found an 
Apprendi
C. 
Custody of Nicolai

We turn to one final issue. When Nicolai was indicted in Puerto Rico, he was already serving a sentence of eleven years to life in New York state prison after pleading guilty to conspiracy to possess with intent to distribute narcotics. Nicolai was transferred to federal custody in Puerto Rico pursuant to a writ of habeas corpus ad prosequendum ("writ") issued in October 1996. At his sentencing on July 31, 2002, Nicolai asked that he be transferred back to New York state prison in order to be closer to his family. On September 17, 2002, the sentencing judge executed an Amended Judgement of Conviction. In committing Nicolai to the care of the United States Bureau of Prisons ("BOP"), the sentencing judge recommended that Nicolai serve his sentence in the state of New York. The sentencing judge noted that his recommendation was non-binding because "any decision regarding prison assignment or custody falls squarely within the power of the executive branch." On September 27, 2002, the New York Department of Correctional Services received a letter from the U.S. Attorney requesting that New York release jurisdiction of Nicolai so that he could serve his federal sentence in federal prison. It complied, and Nicolai is currently in federal prison.

While Nicolai states that he was moved to Puerto Rico via a "detainer pursuant to a writ by the District of Puerto Rico," he does not point to any evidence that supports this assertion.

 While the use of a detainer invokes the IADA, the use of a writ of habeas corpus ad prosequendum does not. 
United States
 v. 
Mauro
United States
 v. 
Beard
, 41 F.3d 1486, 1489 (11th Cir. 1995). Therefore, the IADA is inapplicable.

We note further that, generally, a state that sends a prisoner in state custody to federal authorities pursuant to a writ of habeas corpus ad prosequendum retains jurisdiction over the prisoner because the prisoner is merely "on loan" to the federal authorities. 
See
, 
e.g.
, 
Jake
 v. 
Herschberger
United States
 v. 
Evans
Thomas
 v. 
Brewer
, 923 F.2d 1361, 1366-67 (9th Cir. 1991). However, in the instant case, the federal and state authorities reached an agreement allowing the United States to keep Nicolai in federal prison. 
See
 
Weekes
 v. 
Fleming
, 301 F.3d 1175, 1181 (10th Cir. 2002) (stating that a state may choose "to relinquish or transfer its primary custody to the United States"). We therefore find no error in Nicolai's confinement in federal prison.

III. 
Conclusion
 For the foregoing reasons, the appellants' convictions are affirmed. We vacate their sentences and remand for re-sentencing consistent with this opinion.

Appellants convictions are affirmed, and their sentences vacated and remanded for re-sentencing
.